UNITED STATES of America et al.

v.

STATE OF MICHIGAN et al.

No. M26–73 C.A.

United States District Court,
W. D. Michigan, S. D.

Nov. 13, 1980.

See also, D.C., 89 F.R.D. 307.

James S. Brady, U. S. Atty., U. S. Dept. of Justice, W. D. Mich., Grand Rapids, Mich., Elmer T. Nitzschke, Field Sol., U. S. Dept. of the Interior, St. Paul, Minn., for the U. S.

Stewart H. Freeman, Asst. Atty. Gen., Lansing, Mich., for State of Mich.

Stephen O. Schultz, Foster, Swift, Collins & Coey, Lansing, Mich., for Grand Traverse Area Sport Fishing Ass'n.

Richard B. Baxter, Baxter & Hammond, Grand Rapids, Mich., for Honorable Charles M. Forster, Judge of the Thirteenth Judicial Circuit of the State of Mich.

Bruce R. Greene, Native American Rights Fund, Boulder, Colo., William J. James, Upper Peninsula Legal Services, Sault Ste. Marie, Mich., for Bay Mills Indian Community.

Daniel T. Green, Sault Ste. Marie, Mich., for Sault Ste. Marie Tribe of Chippewa Indians.

William Rastetter, Michigan Indian Legal Services, Traverse City, Mich., for Grand Traverse Band of Ottawa and Chippewa Indians.

## OPINION

FOX, Senior District Judge.

Once again this court is faced with the problem of whether a federal court can enjoin actions of a state court judge. This is an area of the law that a federal judge enters with great reluctance, but one which he must enter if he is to be true to his constitutional obligations. Justice Black in describing the traditional equitable reluctance to interfere with criminal prosecutions stated that comity represents "a system in which there is sensitivity to the legitimate interests of both State and National Government, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37 at 44–45, 91 S.Ct. 746 at 750–751, 27 L.Ed.2d 669 (1971). The *Younger* doctrine is not, however, a stranglehold on the ability of a federal court to enjoin state court proceedings. It merely states a rule that such interference should only be had in very unusual situations.

During the lengthy course of this litigation, this district court has been faced with similar difficult questions. After releasing a comprehensive opinion in May 1979 which stated that the Indians had retained in total their aboriginal right to fish,[1] that this right was reserved in two nineteenth century treaties, and that state fishing laws were inconsistent with this right, a state court suit was filed which challenged the right of certain fishermen to use traditional Indian gear in the Grand Traverse Bay. This district court was petitioned for a restraining order which would preclude the state court from continuing to hear and adjudicate matters concerning the treaties and the Indian right to fish. A temporary restraining order was issued on September 6, 1979, and this was followed on September 17 by a permanent injunction. The action in the state court was viewed as a thinly veiled

---

1. This court has never held that the Indians have an absolute right to fish, nor has this court held that the tribes have a right to 100% of the fish. What this court has held is simply that the Indians have retained their aboriginal rights to fish. They can continue to fish using traditional methods as they have for centuries.

The tribes are not subject to state regulation since their reserved right is not one held "in common with" other citizens as in the *Washington* treaties. That language is not present in the treaties here, and it would be inconsistent with traditional canons of construction to imply those words in these treaties.

attempt to restrict the rights of just those persons whose rights were declared by the May 1979 judgment. An injunction was considered proper by this district court since the state court suit was clearly intended to undermine and relitigate a decision already made by a federal court. An injunction was further needed to aid this court's jurisdiction since any contrary state decision would seriously impair the federal court's flexibility and authority to decide the case. Similar efforts to cripple the flexibility of a federal court had been faced by Judge Boldt in the Washington series of cases. Judge Boldt fully adopted the legal positions set forth by the United States and the Indian tribes, 459 F.Supp. at 1028, fn. 3, and went on to say:

> Based upon the legal arguments and decisions [in the brief], this court is not only satisfied that it has jurisdiction to enjoin the state court proceedings referred to, within the express exceptions to the anti-injunction statute, 28 U.S.C. § 2283, but also believes it has an urgent duty to take such action to the extent shown necessary in order to effectuate its judgment and protect the federal treaty rights declared therein.

\* \* \* \* \* \*

Interference with the exercise of Indian treaty fishing rights indisputably is within the jurisdiction of this federal court, and state court proceedings instituted by nonparties to this lawsuit cannot be allowed to frustrate either final determinations based on extensive research and evidence or the jurisdiction of this federal court.

*United States v. Washington*, D.C., 459 F.Supp. 1020, 1031–32 (1978).

On September 20, 1979, the Honorable Albert J. Engel, Circuit Judge of the United States Court of Appeals for the Sixth Circuit, stayed the judgment of this district court. The basis of Judge Engel's stay was the concern that unless an immediate halt of gill net fishing in the area MM–4 occurred, the area would be fully depleted of fish before any final resolution could be made of the principal litigation, or before the parties in the principal litigation were able to agree upon adequate and equitable regulations to avoid it.[2] On October 19, 1979, a three-judge panel, for the same reasons stated by Judge Engel, continued in effect the stay pending disposition of the appeal.[3]

The Secretary of the Interior issued comprehensive interim regulations governing off-reservation treaty fishing in the Great Lakes on November 15, 1979.[4] On April 28, 1980, the Secretary issued amended interim rules governing off-reservation fishing.[5] These regulations ban or restrict treaty fishing in certain areas, regulate net mesh size, prohibit the harvest of threatened or endangered species and designated sport species, prohibit fishing during the spawning season, prohibit the setting of nets in certain locations at certain times of the year, and provide for emergency regulatory adjustments in the regulations. In the May 28, 1980 remand to this court to consider federal regulatory preemption, the regulations were described as comprehensive.

On May 30, 1980 Circuit Judge Merritt stayed the judgment of the district court pending appeal. The stay was based on apprehensions that intensive gill net fishing would irreparably damage the piscatorial ecosystem. Plaintiffs moved the Circuit Court to vacate or modify the May 30, 1980 stay. They argued that no depletion was occurring since lake trout do not naturally reproduce, and the issue was one of allocation, not depletion or conservation of the species. They contended that the Secretary

---

**2.** Case No. 79–1414, Memorandum and Opinion of the Honorable Albert J. Engel, September 21, 1979, at page 7.

**3.** Case No. 79–1527, United States Court of Appeals, Sixth Circuit, before Weick, Celebrezze and Merritt, Circuit Judges, October 19, 1979.

**4.** 25 C.F.R. Part 256, Subpart D, 44 Fed.Reg. 65747.

**5.** 25 C.F.R. Part 256, Subpart D, 45 Fed.Reg. 28100.

of Interior's regulations, especially the "TAC" provisions, protected the resource.[6] Further, they contended that the State of Michigan had taken action which would eliminate tribal treaty fishing in complete disregard of the standards of *People v. LeBlanc.*[7]

Plaintiffs argued that the effect of the stay on this district court had been to give the state a perceived "green light" to eliminate treaty fishing. Immediately subsequent to the issuance of the stay, Dr. Howard Tanner, Director of the Department of Natural Resources (DNR), issued a letter which was served on all Indian fishermen. The letter stated that "the effect of the Court of Appeals order is that the State of Michigan may enforce state fishing regulations against all persons." Dr. Tanner also stated "you are directed to cease and desist immediately from all fishing operations in violation of state law." Under state law, the use of gill nets is prohibited, so the intent of the Tanner letter, to prohibit all Indian gill net fishing, was an effort to eliminate the treaty right.

By letter dated June 4, 1980, Frank Opolka, Chief of the DNR's Law Enforcement Division, sent a notice to all state licensed wholesalers directing them that they may purchase fish only from those persons permitted to take fish under state law. Since treaty-right fishermen are not licensed under state law, the effect of the Opolka letter was to prohibit state licensed wholesalers from purchasing any Indian caught fish no matter how or from which location those fish were taken.

The Circuit Court stay order and the *per curiam* remand made it clear that the standards for permissible state regulation set forth in *People v. LeBlanc,* supra, should be followed until a decision on appeal was made. Clearly the Tanner and Opolka letters were flagrantly in violation of the *LeBlanc* standard. The state did not show that it could not achieve a reproducing lake trout stock without first reducing or eliminating catch by sport fishers. Instead the State of Michigan and the state court proceeding ignored the *LeBlanc* mandate and ordered the Indians to stop fishing altogether without even addressing the fishing activity of non-treaty sport fishers.

The Sixth Circuit, aware of the threat to the species, and recognizing the need to protect the Indian right to fish, modified the previously entered stay. Probably in reaction to the attempts to eliminate treaty fishing, and the complete disregard for the *LeBlanc* standard, the court announced that:

Indian treaty fishing, including gill net fishing, in that portion of the Great Lakes over which the State of Michigan claims jurisdiction to enforce its fishing laws shall be governed during the pendency of this litigation in the District Court and in this court by the comprehensive regulations issued on this subject by the Secretary of the Interior contained in 25 C.F.R. Part 256, 44 Fed.Reg. 65747 (November 15, 1979), as amended, 45 Fed. Reg. 28100 (April 28, 1980) and as such regulations may hereafter be amended by the Secretary of the Interior, provided however, that "enforcement officer," as defined in § 256.41(e) thereof, 45 Fed. Reg. 28102, shall include conservation officers of the State of Michigan and such other law enforcement officers of the State of Michigan as are authorized un-

---

**6.** Perhaps the most unique part of the regulations is the total allowable catch (TAC) limits. The Ad Hoc Technical Working Group established catch limits in the different statistical zones of the ceded waters, and once those TAC's have been met, the zone is closed to further Indian fishing, regardless of whether the Indians have caught all the fish or none of them.

**7.** *People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199 (1976), provides that regulation of Indians by the state is valid only if:

(1) it is necessary for the preservation of the fish protected by the regulation;

(2) the application of the regulation to the Indians holding off-reservation fishing rights is necessary for the preservation of the fish protected; and

(3) the regulation does not discriminate against the treaty Indians.

der state law to enforce the fishing laws of the State of Michigan.[8]

Certainly this modification of the stay was an effort to bring stability and certainty to the situation. The Sixth Circuit in the broadest language stated the regulations were to be in effect in the portion of the Great Lakes over which the State of Michigan claims jurisdiction. This obviously includes the waters of Grand Traverse Bay. Any other reading of the modification would be contrary to this clear language and would defeat the very purpose of the modification, that is, to strike a balance between treaty rights, non-treaty interests, and the conservation of the species.

The Sixth Circuit also must have been aware of the effect their order would have on statistical zone MM–4. They were aware that under the April regulations, enforcement officer did not include any state conservation officers, and the Court modified the regulations to reflect their intentions. Likewise, the Court must have been aware that the regulations allowed fishing in zone MM–4 north of the 45° North Latitude line. They must have intended that result, otherwise they would have attached a proviso modifying the regulations as they did for "enforcement officer."

Since the July 16, 1980 Order, Judge Forster, Circuit Judge for the Thirteenth Judicial Circuit of the State of Michigan, found Patrick G. Kinney, an enrolled member of the Bay Mills Indian Community and holder of a valid "256" card, in contempt of court for wilfully violating an *ex parte* restraining order issued in 1979. Specifically, Mr. Kinney was observed in a boat in MM–4, north of the 45° North Latitude line, with a box of gill nets but without any fish. Mr. Kinney was sentenced to thirty days in jail and fined two hundred fifty dollars, and his confinement was to commence on October 24, 1980.

On October 23, 1980, attorneys for Patrick G. Kinney came before the district court requesting a temporary restraining order against the state court contempt charge. This court entered a temporary restraining order halting the state court from implementing its contempt order, holding that due to the emergency nature of this action, a temporary restraining order was necessary to preserve the existing conditions while the parties had an opportunity to brief the questions, and provide this court with the time and arguments needed to reach a just result. Jurisdiction was founded on the principle that a federal court has the power to issue a temporary restraining order to preserve existing conditions while it determines whether it has jurisdiction of a matter, that this principle applies to 28 U.S.C. § 2283, and that therefore, a federal court can stay state proceedings temporarily while it considers whether § 2283 applies to the case before it. Further, this court was of the opinion that a restraining order was necessary in aid of this court's jurisdiction and to protect and effectuate the declaratory judgment of this court rendered in *United States v. Michigan*, and the Order of the United States Court of Appeals dated July 16, 1980. On November 3, 1980, hearings on a preliminary injunction were held. Late that afternoon, this court granted a motion extending the Temporary Restraining Order to allow this court the time to reach its decision in this delicate area of federal and state relations.

*Jurisdiction.*

Intervenor-defendant, Grand Traverse Area Sport Fishing Association, strongly contends that this district court has no jurisdiction to issue any injunctive orders. They maintain that the filing of a proper notice of appeal immediately transfers jurisdiction of a case to the court of appeals with respect to any matters involved in the appeal. The May 28, 1980 Order of remand granted the district court only very limited jurisdiction to consider answers to three specific questions, they contend, and that jurisdiction over all other questions was retained by the Court of Appeals.

---

8. Case Nos. 79–1414, 79–1527, 79–1528, United States Court of Appeals, Sixth Circuit, before

Merritt and Martin, Circuit Judges, Peck, Senior Circuit Judge, July 16, 1980.

■ While the general rule is that an appeal to the Circuit Court deprives a district court of jurisdiction as to matters involved in the appeal, "the rule is not a creature of statute and is not absolute in character." *Hoffman v. Beer Drivers and Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976); *Jago v. United States District Court, Northern District of Ohio, Eastern Division of Cleveland*, 570 F.2d 618, 622 (6th Cir. 1978).

■ There are several exceptions to the general rule that necessitate this court having some continuing jurisdiction. First, the district court has a duty to see that the status quo is maintained while the appeal is pending. The subject matter of this litigation is too fragile and important for this court to turn its back while conditions change. The historical and treaty-reserved right of the Indians to fish, and the need to protect a resource from exploitation by both Indians and non-Indians alike, are concerns that the district court should not be required to ignore. If this court were faced with charges that the Indians were fishing beyond the "TAC" levels, and the Area Director of the Bureau of Indian Affairs refused to close that zone despite credible information, then this court would not hesitate to act to protect the resource during the pendency of the appeal. Similarly, where treaty fishermen are wrongfully denied the right to fish under the federal regulations, regulations which the Circuit Court has stated shall govern during this litigation, this court should also be able to act. Several cases have upheld the authority of a district court to enter orders maintaining the status quo, even though an appeal from the district court order is pending in a court of appeals. As the Court in *Hoffman v. Beer Drivers, supra*, stated,

It is our opinion that the rule that an appeal to the circuit court deprives a district court of jurisdiction should not be applied in those cases where the district court, as here, has a continuing duty to maintain a status quo, and where, as the days pass, new facts are created by the parties and the maintenance of the status quo requires new action.

*Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976). *See also Carpenters District Council of Detroit, Wayne, Oakland and Macomb Counties and Vicinity v. Morse*, 455 F.Supp. 535 (E.D.Mich.S.D.1978), and *United States v. EL-O-Pathic Pharmacy*, 192 F.2d 62, at 79 (9th Cir. 1951).

The second exception to the general rule is that:

The district court also has full authority to interpret the scope and meaning of a stay by a Court of Appeals, just as it would have power to interpret any other appellate order.

*Reed v. Rhodes*, 472 F.Supp. 603, 605 (N.D. Ohio, 1979). Here, the plaintiffs' motion for the preliminary injunction is based primarily on the Court of Appeals Order of July 16, 1980, imposing the Secretary's treaty fishing regulations on the parties pending the outcome of the appeal. The core of this dispute centers around that July 16, 1980 order. If that order allows Patrick G. Kinney to fish in MM-4 as the regulations permit, then the state court contempt citation should be enjoined. If, however, that order did not affect the state court ban on MM-4, then the state contempt proceeding is valid. Since the interpretation of a court of appeals order is at issue, the district court has full authority to interpret the scope and meaning of that order.

Finally, this court has jurisdiction based on the fact that an appeal of the district court's opinion of May 7, 1979 does not divest the district court of its duty to supervise continuing conduct. In *Hoffman v. Beer Drivers, supra* at 1276, the Court of Appeals for the Ninth Circuit said:

We believe the rule should be, and we so hold that, in the kinds of cases where the court supervises a continuing course of conduct, and where as new facts develop additional supervisory action by the court is required, an appeal from the supervisory order does not divest the district court of jurisdiction to continue its supervision, even though in the course of that supervision the court acts upon or modi-

fies the order from which the appeal is taken.

Here, neither the fishery nor the dispute between the parties remains static. There is a continuing course of conduct between the parties which, from time to time, may require the district court to intercede.

The Court of Appeals stated in the May 28, 1980 remand order that they were inclined to the view that *People v. LeBlanc, supra,* has correctly stated the applicable standard governing state regulation. Further, the July 16, 1980 Order stated that the federal regulations would govern during the pendency of the appeal. Certainly, the district court must be able to act to insure that the parties comply with these orders. The relationship between the fishery resource and the rights and demands of both Indian and non-Indian user groups is a dynamic relationship. As new facts develop, the district court must be able to protect, not only the resource, but the interests of these various groups. If things are to remain constant during the appeal, then the district court must be able to take additional supervisory action, consistent with the circuit court orders, when the circumstances warrant it. This court does not wish to assume the role of a "perpetual fishmaster,"[9] but when aboriginal rights recognized by federal courts of appeal are ignored by state courts, or when harm to the resource is apparent, the court certainly has the duty and jurisdiction to act.

*The Anti-Injunction Statute.*

 Whenever a federal court issues an injunction restraining state court proceedings, it should consider whether the action will be contrary to the prohibition contained in the anti-injunction statute, 28 U.S.C. § 2283, which provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, *or where necessary in aid of its jurisdiction, or to protect or effectuate its judgment.* (Emphasis added.)

The basic purpose of the statute is to protect against needless friction between the state and federal courts.[10] This court is of the opinion, however, that § 2283 does not prohibit the relief sought in this instance.

The Supreme Court has clearly held that § 2283 is inapplicable when it is the United States that seeks to stay proceedings in a state court. In *Leiter Minerals, Inc. v. United States,* Justice Frankfurter looked to the policy the statute serves.

The statute is designed to prevent conflict between federal and state courts. This policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings, except under the severe restrictions of 28 U.S.C. § 2283, would be so

**9.** In *United States v. Washington,* 9 Cir., 520 F.2d 676, 693, District Judge Burns, in a concurring opinion, stated:

I concur, but I want to add a brief comment from the viewpoint of a district judge. As was suggested at oral argument, any decision by us to affirm also involves ratification of the role of the district judge as a "perpetual fishmaster." Although I recognize that district judges cannot escape their constitutional responsibilities, however unusual and continuing duties imposed upon them, I deplore situations that make it necessary for us to become enduring managers of the fisheries, forests, and highways, to say nothing of school districts, police departments, and so on. The record in this case, and the history

set forth in the *Puyallup* [*Department of Game of Washington v. Puyallup Tribe,* 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254] and *Antoine* [*Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129] cases, among others, make it crystal clear that it has been recalcitrance of Washington State officials (and their vocal non-Indian commercial and sports fishing allies) which produced the denial of Indian rights requiring intervention by the district court. This responsibility should neither escape notice nor be forgotten.

**10.** See *Mitchum v. Foster,* 407 U.S. 225, 232–233, 92 S.Ct. 2151, 2156–2157, 32 L.Ed.2d 705 (1972).

great that we cannot reasonably impute such a purpose to Congress from the general language of 28 U.S.C. § 2283 alone. It is always difficult to feel confident about construing an ambiguous statute when the aids to construction are so meager, but the interpretation excluding the United States from the coverage of the statute seems to us preferable in the context of healthy federal-state relations.[11]

Judge Boldt in the *Washington* cases also held that § 2283 was inapplicable when the United States sought to stay a state court proceeding.[12] He declared that the United States and the Indian tribes asserted superior federal interests which overrode the comity principle. In the instant situation, § 2283 should also be inapplicable since the United States and the tribes are requesting the relief sought, thus making *Leiter Minerals* clearly controlling.

If a case comes within § 2283, one of the exceptions to that statute must be operative, otherwise a federal court is absolutely barred from enjoining state court proceedings. As the Supreme Court stated in the *Atlantic Coast Line* case:

> Any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. Moreover, since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction. Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court.

*Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970). Here, even if § 2283 is applicable, it is clear that an injunction is proper under the literal terms of that statute.

*The Injunction is Necessary to Protect and Effectuate a Judgment.*

This court entered a declaratory judgment which among other things declared that treaty fishing rights were not held "in common with" other residents of the state, and that the State of Michigan had no jurisdiction over the exercise of the fishing rights of the plaintiff tribes. The State challenges that determination in the Court of Appeals, and the appeal is pending. Before the Court of Appeals can issue its determination, the district court must address certain issues regarding federal regulatory preemption. In the meantime, the Order of the Court of Appeals dated July 16, 1980 makes it absolutely clear that during the pendency of the litigation in this court and in the Court of Appeals, the Secretary's treaty fishing regulations shall govern the activities of treaty fishers. Those regulations do not prohibit the use of gill nets in MM–4. The state circuit court found Mr. Kinney in criminal contempt for engaging in the precise activity that the district court and the Court of Appeals have permitted. This court must act, therefore, to enjoin the state circuit court's criminal contempt finding in order to protect and effectuate its declaratory judgment, and the Court of Appeals Order of July 16, 1980.

It is clear that the exception to the prohibition in § 2283 for injunctions needed to protect and effectuate a federal court's judgment was inserted with a case such as this in mind. If this court acts, it must necessarily enjoin state proceedings, and therefore move into the delicate area of state and federal relations. However, if this court shirks its responsibilities, a valid order entered by the United States Court of Appeals will be negated through the actions of a state court judge.

---

11. *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 227–228, 77 S.Ct. 287, 291–292, 1 L.Ed.2d 267 (1957).

12. 459 F.Supp. 1020, 1028 N.3 (W.D.Wash. 1978), Decision, Injunction and Order re State Court Injunction Preventing Enforcement of Certain Department of Fisheries Regulations, September 12, 1974.

*The Injunction is Necessary in Aid of the Court's Jurisdiction.*

■ The injunction sought in this case meets a second exception in § 2283—it is necessary in aid of the court's jurisdiction. Where the federal action is not based on diversity jurisdiction, but involves matters of peculiarly federal concern, the appropriate test of whether an injunction is necessary in aid of the court's jurisdiction is whether the state court proceedings may limit the federal court's options in disposing of the case. *Capital Service, Inc. v. NLRB*, 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887 (1954). This aspect of federal court flexibility was emphasized in *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970), where the Court stated that the in aid of jurisdiction exception implies

> that some federal injunctive relief may be necessary to prevent a state court from interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.

It is obvious that to allow the state court to imprison Indians for exercising rights under regulations which the Court of Appeals has stated shall control during this litigation, would seriously hamper, if not virtually destroy this Court's authority and flexibility in dealing with the instant case. If the Circuit Court's Order meant that fishing under the regulations is allowed in all waters over which Michigan claims jurisdiction, then the contempt charge against Mr. Kinney is an affront to the Circuit Court's power and integrity. As Judge Boldt noted in the *Washington* litigation:

> Cases are legion which affirm the exercise of a federal court's power to prevent state court action from interfering with federal jurisdiction and from undermining federal court judgments. Many of these cases arose in situations such as the present where a federal court has forged remedies to protect the rights under federal law of a disadvantaged minority, only to be called immediately to defend its judgment from hostile flanking movements in state court.[13]

Therefore, this court must be able, under the exceptions of § 2283, to protect and effectuate prior Orders of the Circuit Court.

*Comity.*

■ Even though the injunction against state proceedings is not barred by § 2283, because the statute is not applicable when the United States seeks the injunction, and because this case comes within two of the exceptions to the statute, the injunction still may be refused on comity grounds. The various abstention doctrines may counsel that the federal court refrain from issuing an injunction. As the court in *United States v. Augspurger*, D.C., 452 F.Supp. 659, 668 (1978), stated:

> The Government contends that 28 U.S.C. § 2283 does not apply when the United States is the plaintiff. Although this assertion is correct, the general rules of comity do apply even when the United States is the plaintiff.

Further, even when the power exists to stay state court proceedings, the exercise of that power is discretionary, allowing the court to weigh those factors both pro and con to the issuance of a stay.[14]

Beginning with the case of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court began developing a concept which stands for the notion that under certain circumstances a federal court should refuse to exercise its power to restrain a state court proceeding concerned with the interpretation of uncertain questions of state law due to the doctrines of comity, restraint and federalism. Intervenor-defendant urges that the decision of the Supreme Court in *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), is directly on point and disposes absolutely of plaintiffs' claim for relief. In *Juidice v. Vail*, the defendant was a state judgment

---

**13.** *Id.* at 1029.

**14.** *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1274 (7th Cir. 1976).

debtor who, after being served with a subpoena to attend a deposition to give information regarding satisfaction of the judgment against him, failed to appear. The state court issued an order to show cause why the defendant should not be punished for contempt, and later entered an order holding him in contempt. The defendant then filed a federal court action seeking to enjoin, on behalf of a plaintiff class and himself, the use of statutory contempt procedures on the ground the procedures violated the Fourteenth Amendment of the United States Constitution.

Justice Rehnquist in the majority opinion discussed the notions of comity, and the respect federal courts should have for state functions. He cited *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), for the proposition that a "federal court cannot interfere in a case where the proceedings were already pending in a state court." [15] He then stated:

> These principles apply to a case in which the State's contempt process is involved. A state's interest in the contempt process, through which it vindicates the regular operation of its judicial system, so long as that system itself affords the opportunity to pursue federal claims within it, is surely an important interest.[16]

The Court further noted that "*Younger* principles do not apply, even where otherwise applicable:

> In those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith...." [17]

Intervenor-defendant urges that the opportunity to present a federal claim in state proceedings is sufficient to bar federal intervention. Proceeding through the state appellate procedure with final recourse to the United States Supreme Court is urged as the proper procedure.

This court is of the opinion that *Juidice v. Vail, supra,* and the other *Younger* cases [18] are not controlling in this situation. The *Younger* line of cases has generally involved subsequently filed federal suits by private plaintiffs for injunctive and declaratory relief against state criminal, quasi-criminal, and in limited situations civil statutes. In the case at bar, the state case before the Thirteenth Judicial District was not on file at the time the instant federal case began. Further, Mr. Kinney was charged with a violation of the state court restraining order because he fished after the July 16, 1980 Order, and in an area in which the regulations allowed him to fish. The *Younger* cases do not restrict a federal court from acting to prevent state court proceedings that are contrary to express orders of federal circuit courts. The *Younger* cases involved challenges to state statutes on Fourteenth Amendment grounds, they do not involve instances where a state court acts contrary to express federal orders. Attorneys for Mr. Kinney did not challenge the validity of a state statute, rather they are here challenging state court actions which appear to boldly contradict the wishes of the Sixth Circuit. The Supreme Court never required a district court to abstain where the state court proceeds in this manner.

Nor is the argument that Mr. Kinney should pursue the state appeals process convincing in this instance. While generally, one should pursue his appeal in state court and raise his federal defenses there, this situation is different. A recent Order by the Sixth Circuit appears to have given Mr. Kinney the right to fish under the regulations in all waters over which the State of Michigan claims jurisdiction, and pursuant to that Order, Mr. Kinney exercised his rights. An appeal through the state courts with final review in the Supreme Court would be futile. The propriety of Mr. Kin-

---

15. *Juidice v. Vail,* 430 U.S. 327, 335, 97 S.Ct. 1211, 1217, 51 L.Ed.2d 376 (1977).

16. *Id.*

17. *Id.* at 338, 97 S.Ct. at 1218.

18. *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 974 (1979); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Huffman v. Purse, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

ney's action depends on the intent of the Sixth Circuit when they issued the July 16 Order. To require Mr. Kinney to pursue his claims in state courts would deny him the only authoritative decision on what that Order meant. Practically speaking, the only way the parties can determine if fishing is allowed in the northern half of MM–4 as the regulations authorize, is to seek an answer in the Sixth Circuit, and only through an appeal of this decision can that happen.

This opinion does not reflect a belief that state courts are incapable of performing their duty, nor is it intended to do so. The State of Michigan is fortunate that their courts are occupied by highly competent and professional jurists. The gravaman of this dispute, however, is that a federal court has recognized rights to fish under the Secretary's regulations and the state court has restricted the scope of that order. The *Younger* progeny never intended that federal courts be impotent to enforce and protect the full scope of their orders from state court infringement.

Strenuous arguments were made by attorneys for the Thirteenth Circuit Judge that if this court grants the relief requested, the effect would be to close the state courthouse doors. Those arguments are sophistic. The relief sought here involves only Patrick G. Kinney, "no more and no less." [19] Further, this action only concerns his allegedly contemptuous behavior after the July 16, 1980 Order. The only restriction on the state court would be in enforcing the contempt charge against Patrick G. Kinney. This certainly does not close the door to the courthouse.

It should be kept in mind that we are dealing with an Indian treaty case. The relation of the Indian tribes to the people of the United States has always been an anomalous one and of a complex character. *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). As the

Supreme Court in *The Kansas Indians*, 5 Wall. 737, 755, 18 L.Ed. 667 (1867), stated, the Indians are "a people distinct from others." The Indian sovereignty doctrine "provides a backdrop against which the applicable treaties and federal statutes must be read." *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). Further, the United States stands in a guardian-ward relationship to the sovereign Indian people. The protection of that relationship is a national goal of the highest order and this court has an obligation to see that this goal is met. Where the United States and the Indian tribes join in seeking relief, they assert superior federal interests which override the comity principle. *United States v. Washington*, 459 F.Supp. 1020, 1030 (W.D. Wash.1978).

The *Younger* line of cases simply is inapplicable in this situation. To close the federal courthouse doors to the United States is too great an extension of the *Younger* rationale. Ongoing federal litigation, and valid Circuit Court judgments cannot be unduly limited by state courts, and then have those state courts hide behind the shield of *Younger*. Comity is a two-way street. It is "a system in which there is sensitivity to the legitimate interests of both State and National Government.[20] This court is not unduly interfering with legitimate activities of the state by enjoining the state contempt charge. The relief sought here, merely protects the integrity and spirit of federal court orders, and *Younger* does not deny this power.

*Relief.*

In the Sixth Circuit, the standards applicable to the issuance of a preliminary injunction are well established. In *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977), the Circuit Court set forth four standards which must be considered:

19. Statement of Bruce R. Greene, attorney for the Bay Mills Indian Community, made during arguments for a preliminary injunction, November 3, 1980.

20. *Younger v. Harris*, 401 U.S. 37, 44–45, 91 S.Ct. 746, 750–751, 27 L.Ed.2d 669 (1971).

(1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiffs have shown irreparable injury;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) Whether the public interest would be served by issuing a preliminary injunction.

Here, the plaintiffs have shown a substantial likelihood of success on the merits. Plaintiffs contend that the July 16, 1980 Order allowed fishing under the regulations in all waters over which Michigan claims jurisdiction, including the waters of MM–4. Since the regulations allow fishing in MM–4 north of the 45° North Latitude line, and since this is where Mr. Kinney was fishing, he should not be found in contempt by the state court for violating its earlier *ex parte* restraining order. This court finds that view to be the most credible one. Judge Engel's stay on this court was based largely on his fear that gill net fishing had to be halted until a final resolution could be made of the principal litigation, or the parties in the principal litigation were able to agree upon adequate and equitable regulations to avoid depletion.[21] Since that stay, the Secretary of Interior has promulgated rules concerning treaty fishing. These regulations were described as comprehensive. They ban or restrict fishing in certain areas, regulate net mesh size, prohibit the harvest of threatened or endangered species and designated sport species, prohibit fishing during the spawning season, prohibit the setting of nets in certain locations at certain times of the year, and provide for emergency regulatory adjustments in the regulations. It appears to this court that the Secretary's regulations have calmed the concerns of the Circuit Court that Indian treaty fishing, free of state regulation, would totally deplete lake trout stocks. It also appears that the Circuit Court is aware

of the high burden *People v. LeBlanc* places on state regulation. Under *LeBlanc* there can be no regulation of treaty fishing until it is shown that conservation goals cannot be met by controlling non-Indian fishing. Further, under *Puyallup II*, the Circuit Court is obviously aware that banning the use of gill nets is an impermissible form of discrimination against the tribes, and cannot pass muster of the *LeBlanc* standards. The July 16, 1980 Order is a compromise between the rights of the Indians, the protection of the resource, and the interests of non-treaty fishers.

It is probable the July 16, 1980 Order was also intended to affect the state court ban on Indian fishermen. That Order, in the broadest language possible, stated that the regulations were to govern Indian fishing in that portion of the Great Lakes over which Michigan claims jurisdiction. MM–4 is certainly within that extensive modification. The Circuit Court was also aware that their Order was in conflict with the state court order. The Circuit Court knew "enforcement officer" as defined in the April regulations no longer included state enforcement officers, and the Court expressly changed the regulations to conform to their wishes. This court finds it incredible that the Circuit Court was unaware of the potential conflict in MM–4. The Court obviously understood the regulations, and used the broadest terms to apply them. If the Court had not wanted to affect fishing in MM–4, it is probable that they would have added a provision to their Order. Since they did not, this court is not going to imply one. Therefore, considering the standards of *People v. LeBlanc*, and the broad language of the July 16, 1980 Order, plaintiffs have shown a substantial likelihood or probability of success on the merits.

The second factor plaintiffs must demonstrate is irreparable injury. This they have done. If this court does not grant the injunctive relief sought, the harm suffered by Mr. Kinney and his family will

21. Case No. 79–1414, Memorandum and Opinion, Albert J. Engel, Circuit Judge, September 21, 1979.

be great. He will be confined to jail for thirty days, the maximum sentence that could be imposed. Further, the right interfered with by the state court is one protected by the Constitution. A state, its political subdivisions and its citizens may not constitutionally abrogate or diminish a federal treaty right to fish protected by the Supremacy Clause to the United States Constitution. Where denial of fundamental interests such as constitutional rights are involved, damage is presumed to be irreparable and an injunction should issue as a matter of course.

The third factor this court must consider is whether the issuance of a preliminary injunction would cause substantial harm to others. Here it is difficult to imagine just what damage would be suffered by the state court if an injunction were granted. The effect of an injunction would be to merely postpone Mr. Kinney's incarceration until the Court of Appeals decides the pending consolidated matters. On the other hand, if the plaintiffs' position on appeal is upheld, Mr. Kinney's confinement cannot be reversed once it has been served. Further, an injunction here in no way harms the other proceedings in state court. The parties are free to litigate the issues, and the court does not lose any power to enforce other orders. There is no apparent harm to sport fishermen or other non-treaty users of MM–4 either. These groups must accept the fact that treaty Indians have rights to fish distinct from non-Indians. Further, no threat to the species has been shown by Indian fishing in this zone. The "TAC" provisions require the Indians to stop fishing, and the area be closed to Indian fishing once certain pound limits have been met. This court was not shown any evidence that the area should be so closed.

This court is of the opinion that the public interest would be served by the issuance of a preliminary injunction. Both this court and the Michigan Supreme Court have held that the Indians have retained and reserved special treaty rights to fish in the ceded waters. The public interest clearly favors the protection of these treaty rights.

Here, the United States, which stands in a guardian-ward relationship to the Indians, has acted in pursuit of its special duties to protect treaty fishing rights. *Enforcement of such rights is a national goal of the highest order* and clearly is a superior federal interest. See: President's Message to Congress, July 18, 1970. *United States v. Washington*, D.C., 459 F.Supp. 1020, 1031, fn.3 (1978) (emphasis added). An injunction should also issue because an individual who acted in apparent good faith reliance on an Order of the United States Court of Appeals faces imprisonment. It is clearly in the public interest that those who obey federal orders should not be punished by inferior state court actions for their obedience.

No security or bond will be required of Patrick G. Kinney, since the United States is the party seeking the relief. In addition, no bond will be required since only negligible harm will result if this injunction is wrongful, and the strong public interest is an overriding concern.

This court does not eagerly or zestfully enter injunctions restraining state court proceedings. The regulations are a medium for preserving the resource and respecting the ancient, treaty-reserved rights to fish while the appeal is pending, and they have been made the supreme law in all waters over which Michigan claims jurisdiction by Order of the Circuit Court. For a state court to abrogate this right, or ignore the commands of a federal appellate court, are events which demand this court act. An individual should not have to be in state jails because he obeyed a Circuit Court Order. Therefore, a preliminary injunction will be issued enjoining the state court from enforcing or implementing the order of contempt against Patrick G. Kinney pending the outcome of the consolidated appeals.

## PRELIMINARY INJUNCTION

The court having considered all evidence, briefs and oral arguments of the parties, and being fully advised in the premises, finds and concludes as follows:

(1) That on May 8, 1979 this court issued a comprehensive opinion on the right of certain Michigan Indians to fish. This opinion declared that the aboriginal right of Indians to fish was reserved in total in the Treaty of Ghent and Treaty of 1836, and this right was not abrogated or diminished by the Treaty of 1855. State fishing laws were inconsistent with this right, and further, tribal regulation preempted any state authority to regulate fishing activity of tribal members. (*United States v. Michigan,* 471 F.Supp. 192 (W.D.Mich.1979)).

(2) That in that decree, this court retained jurisdiction of the case to make rulings and to issue such orders as may be just and proper upon the facts and law, and in the implementation of this decree. (*United States v. Michigan,* 471 F.Supp. 192, 281 (W.D.Mich.1979)).

(3) That Notice of Appeal was filed on July 2, 1979. (Case No. 79–1414).

(4) That subsequent to this court's decision, a state circuit court was petitioned to enjoin non-licensed gill net fishermen from fishing in state statistical zone MM–4, which includes most of the waters of the Grand Traverse Bay, and some adjoining waters of Lake Michigan. The suit was filed by the Grand Traverse Area Sports Fishing Association and was encaptioned, *Grand Traverse Area Sports Fishing Ass'n v. Clarence Maudrie, et al.,* File No. 79–7510, in the Circuit Court for the County of Grand Traverse.

(5) That the Honorable Charles M. Forster, Judge of the Thirteenth Judicial Circuit of the State of Michigan sitting as Circuit Court Judge for Grand Traverse County, issued an *ex parte* temporary restraining order prohibiting gill net fishing in the waters of MM–4.

(6) That this court was then petitioned for a restraining order which would preclude the state court from continuing to hear and adjudicate matters concerning the treaties, and the Indian right to fish. A temporary restraining order was issued on September 6, 1979, and this was followed on September 17 by a permanent injunction.

(7) That on September 21, 1979, the Honorable Albert J. Engel, Circuit Judge of the United States Court of Appeals for the Sixth Circuit, stayed the judgment of the district court entered September 17, 1979. The basis of Judge Engel's stay was the concern that unless an immediate halt of gill net fishing in area MM–4 occurs, the area will be fully depleted of fish before any final resolution can be made of the principal litigation, or before the parties in the principal litigation are able to agree upon adequate and equitable regulations to avoid it. (Case No. 79–1414, Memorandum and Opinion of the Honorable Albert J. Engel, September 21, 1979, at page 7).

(8) That on October 19, 1979, a three-judge panel, for the reasons stated by Judge Engel, continued in effect the stay pending the disposition of the appeal in this case, and case No. 79–1414. (Case No. 79–1527, United States Court of Appeals, Sixth Circuit. Before: Weick, Celebrezze and Merritt, Circuit Judges, October 19, 1979).

(9) That on November 15, 1979, the Secretary of Interior issued comprehensive interim regulations governing off-reservation treaty fishing in the Great Lakes. 25 C.F.R. Part 256 (subpart D), 44 Fed.Reg. 65747.

(10) That on April 28, 1980, the Secretary of the Interior issued amended interim rules governing off-reservation treaty fishing. 25 C.F.R. Part 256, 45 Fed.Reg. 28100. Said regulations ban or restrict treaty fishing in certain areas, regulate net mesh size, prohibit harvest of threatened or endangered species and designated sport species, prohibit fishing during the spawning season, prohibit the setting of nets in certain locations at certain times of year, and provide for emergency regulatory adjustments in the regulations.

(11) That on May 28, 1980, the Court of Appeals remanded Case No. 79–1414 to the District Court for a decision on the question of federal regulatory preemption. The Secretary of the Interior's regulations were described as comprehensive.

(12) That on May 30, 1980, Circuit Judge Merritt stayed the judgment of the District

Court pending appeal. Said stay was based on apprehensions that intensive gill net fishing would irreparably damage the piscatorial ecosystem. (79–1414, 6th Cir. May 30, 1980).

(13) That plaintiffs moved the Circuit Court to vacate the May 30, 1980 stay. They argued that no depletion was occurring since lake trout do not naturally reproduce, and the issue was one of allocation, not depletion. They contended that the Secretary of Interior's regulations, especially the "TAC" provisions, were sufficient protection for the species. Further, they contended that the State of Michigan had taken action which would eliminate tribal treaty fishing, in complete disregard of the standards of *People v. LeBlanc*, 399 Mich. 31, 248 N.W.2d 199 (1976).

(14) That on July 16, 1980, a three-judge panel of the Circuit Court modified the stay as follows:

> Indian treaty fishing, including gill net fishing, in that portion of the Great Lakes over which the State of Michigan claims jurisdiction to enforce its fishing laws shall be governed during the pendency of this litigation in the District Court and in this Court by comprehensive regulations issued on this subject by the Secretary of the Interior contained in 25 C.F.R. Part 256, 45 Fed.Reg. 28100 (April 28, 1980) . . . .

(Nos. 79–1414, 79–1527, 79–1528, 6th Cir. July 16, 1980.)

(15) That Patrick G. Kinney is an enrolled member of the Bay Mills Indian Community who has been licensed to fish by the tribe and holds a treaty fishing identification card, issued pursuant to 25 C.F.R. Part 256, subpart D, signed by the chairmen of his tribe and countersigned by the Bureau of Indian Affairs.

(16) That Mr. Kinney is a named defendant in the state case heard by Judge Charles M. Forster, Circuit Judge for the Thirteenth Judicial Circuit of the State of Michigan, entitled *Grand Traverse Area Sport Fishing Ass'n, et al.*, File No. 79–7510 C.E.

(17) That on October 14, 1980, Judge Forster found Mr. Kinney in criminal contempt of court for wilfully violating an *ex parte* restraining order, to-wit, he was observed in a boat in MM–4, north of the 45%al North Latitude line, with a box or boxes of gill nets but without any fish.

(18) That the Secretary of Interior's regulations permit fishing in MM–4 north of the 45° North Latitude line. (25 C.F.R. Part 256, subpart D, § 256.46(a)(1), 45 Fed. Reg. at 28103).

(19) That Mr. Kinney was sentenced to thirty days in jail and fined two hundred fifty dollars, which is the maximum possible punishment, and that his confinement was to commence on October 24, 1980.

(20) That on October 23, 1980 attorneys for Patrick G. Kinney came before this court requesting a temporary restraining order against this state court contempt charge.

(21) That this court entered a temporary restraining order halting the state court from implementing its contempt order, holding that due to the emergency nature of this action, a temporary restraining order was necessary to preserve the existing conditions, while the parties had an opportunity to brief the questions, and provide this court with the time and arguments needed to reach a just result.

(22) That jurisdiction was founded on the principle that a federal court has the power to issue a temporary restraining order to preserve existing conditions while it determines whether it has jurisdiction of a matter, that this principle applies to 28 U.S.C. § 2283 and that a federal court, therefore, can stay state proceedings temporarily while it considers whether § 2283 applies to the case before it. Further, a restraining order was necessary in aid of this court's jurisdiction and to protect and effectuate the declaratory judgment of this court rendered in *United States v. Michigan*, and the Order of the United States Court of Appeals dated July 16, 1980, and to give aboriginal rights guaranteed Patrick Kinney by a congressionally approved treaty their intended scope.

(23) That on November 3, 1980, after arguments on a preliminary injunction, this court granted a motion extending the previously entered Temporary Restraining Order for a period not to exceed ten days or until a decision was rendered on the motion, whichever period was shorter.

(24) That the general rule that an appeal to the Circuit Court deprives a district court of jurisdiction as to matters involved in the appeal, is not a creature of statute and is not absolute in character.

(25) That this court has jurisdiction to act since a federal district court has a duty to see that the status quo is maintained while the appeal is pending, a federal district court has full authority to interpret the scope and meaning of a stay by a Court of Appeals, just as it would have power to interpret any other appellate order, and since an appeal of a federal district court's opinion does not divest the court of its duty to supervise continuing conduct.

(26) That the July 16, 1980 Order stated that the federal regulations would govern during the pendency of the appeal, and the federal district court must be able to act to insure that the parties comply with this order.

(27) That the relationship between the fishery resource and the rights and demands of both Indian and non-Indian user groups is a dynamic relationship, and as new facts develop, the federal district court must be able to protect, not only the resource, but the interests of these various groups.

(28) That the anti-injunction statute, 28 U.S.C. § 2283, does not apply since the United States and the Indian tribes are requesting the relief sought.

(29) That if the anti-injunction statute is applicable, an injunction is proper under two exceptions to the act, since relief is necessary to protect and effectuate a judgment, and necessary in aid of the court's jurisdiction.

(30) That the abstention principles and the doctrine of comity do not prevent the issuance of an injunction since this is not a situation involving a subsequently filed federal suit attacking a state statute on constitutional grounds, but rather is a situation where a state court has taken action which boldly contradicts a federal appellate order.

(31) That a federal court has recognized rights to fish under the Secretary's regulations and the state court has restricted the scope of that order. The *Younger* progeny never intended that federal courts be impotent to enforce and protect the full scope of their orders from state court infringement.

(32) That plaintiffs have shown a substantial likelihood of success on the merits. The July 16, 1980 Order, in the broadest language possible, stated the regulations were to govern Indian fishing in that portion of the Great Lakes over which Michigan claims jurisdiction. This certainly includes the waters of MM-4.

(33) Plaintiffs have also demonstrated irreparable injury. If relief is not granted Patrick G. Kinney will be confined in jail for thirty days. Further, where there is a denial of constitutionally protected rights, damage is presumed to be irreparable.

(34) That the issuance of a preliminary injunction will not cause substantial harm to others. No harm results to the state court proceedings, to other users of MM-4, nor has any threat to the fishery resource been shown.

(35) That the public interest would best be served by the issuance of an injunction. The protection and enforcement of Indian treaty rights *"is a national goal of the highest order,"* (See: President Nixon's Message to Congress, July 18, 1970) (emphasis added), and further it is clearly in the public interest that those who obey federal orders should not be punished by state courts for their obedience.

(36) That no security or bond will be required of Patrick G. Kinney since the United States is the party seeking the relief, and since only negligible harm will result if this injunction is wrongful, and the strong public interest is an overriding concern.

NOW, THEREFORE, IT IS ORDERED, that the Honorable Charles M. Forster,

Judge of the Thirteenth Judicial Circuit of the State of Michigan, or anyone sitting in his stead, is hereby enjoined from enforcing the criminal contempt charge against Patrick G. Kinney pending the outcome of the consolidated appeals.