**GRAND TRAVERSE BAND OF CHIPPEWA and OTTAWA INDIANS, Plaintiff,**

v.

**DIRECTOR, MICHIGAN DEPARTMENT OF NATURAL RESOURCES, Township of Leland;**

and

**Village of Northport, Defendants.**

No. 1:94:CV:707.

United States District Court, W.D. Michigan.

Dec. 19, 1995.

**284**

William Rastetter, Cedar, MI, for Grand Traverse Band of Chippewa and Ottawa Indians.

Todd B. Adams, Asst. Atty. General, Frank J. Kelley, Attorney General, Natural Resources Division, Lansing, MI, Cheryl B. Lord, Asst. Atty. General, Appellate Division, Lansing, MI, for Director MI. Dep. Nat. Res.

Stephen O. Schultz, Foster, Swift, Collins & Smith, Lansing, MI, James L. Wernstom, Law, Weathers & Richardson, Grand Rapids, MI, Thomas Joseph McGraw, Cox, Hodgman & Giarmarco, Tray, MI, for Township of Leland, Village of Northport.

### *PARTIAL JUDGMENT*

ENSLEN, Chief Judge.

In accordance with the opinion entered on this date,

**IT IS HEREBY ORDERED** that the motion for summary judgment (dkt.# 36) filed by plaintiff Grand Traverse Band of Ottawa and Chippewa (GTB) is **GRANTED in part and DENIED in part.**

The motion is **granted** as to plaintiff GTB's treaty-based claim to establish mooring access at the Leland and Northport marinas as herein described, and as to the claim for a declaration that Leland and Northport may not bar the tribal fishers from the access to the Leland and Northport facilities herein described without facing injunctive and any other necessary action for violating this Court's 1985 Consent Order in *United States v. Michigan,* 2:73–CV–26.

The motion is **denied** as to plaintiff GTB's equal protection claims against Northport and the Director, Michigan Department of Natural Resources.

**IT IS FURTHER ORDERED** that the GTB fishers have the right to transient use of the Leland and Northport marina facilities, including mooring slips, in order to access traditional fishing areas in grids 714 and 615, fish with impoundment gear and fish for chubs, unload nets, off-load fish, and seek shelter during emergencies.

**IT IS FURTHER ORDERED** that the motion for summary judgment (dkt.# 38) filed by defendants Northport and Leland is **GRANTED in part and DENIED in part.**

The motion is granted on plaintiff's equal protection claim against Northport.

The motion is denied in all other respects

**IT IS FURTHER ORDERED** that defendant Northport is entitled to **JUDGMENT** on plaintiff GTB's equal protection claim.

**IT IS FURTHER ORDERED** that defendant Director, Michigan Department of Natural Resources is entitled to **JUDGMENT** on plaintiff GTB's equal protection claim.

**IT IS FURTHER ORDERED** that plaintiff GTB may file a motion on its due process claim no later than seven (7) days from receipt of this Opinion and Order. The defendants may file a response no later than seven (7) days from receipt of any such motion. The plaintiff GTB may file a reply no later than four (4) days from receipt of any response.

### *OPINION*

In this action, plaintiff, the Grand Traverse Band of Ottawa and Chippewa Indians ("GTB"), claims that the defendants, Director of the Michigan Department of Natural Resources ("MDNR"), Village of Northport ("Northport"), and Leland Township ("Leland"), have violated the GTB's treaty-reserved fishing rights and federal constitutional rights to due process and the equal protection of the laws, as well as contravened prior orders of this Court by preventing members of the GTB from mooring their

commercial fishing vessels at the Northport and Leland public marinas.

Presently before the Court are cross motions for summary judgment filed by plaintiff GTB and defendants Leland and Northport.

## FACTS

For centuries, Ottawas and Chippewas have fished the waters of the Great Lakes for subsistence and trade. Following the settling in the Great Lakes Area of non-Native-Americans, the Grand Traverse Ottawas and Chippewas (historical predecessors to the GTB) signed treaties with the United States in 1836 and 1855, reserving for themselves, among other rights, the right to continue commercial and subsistence fishing.

In the 1836 Treaty, the Grand Traverse Ottawas and Chippewas reserved the right to fish in their usual places, which included the waters off of Leelenau Peninsula. In the 1855 Treaty, these tribal signatories preserved reservations on the shores of Lake Michigan and Grand Traverse Bay along the grounds that they had traditionally used for lake fishing. The Northport and Leland marinas that are the subject of this litigation today are located within the boundaries of these 1855 reservations. In fact, the Leland and Northport areas historically were used by the Ottawas and Chippewas to access fishing sites in Lake Michigan and Traverse Bay. Indeed, despite their loss of title to the land, GTB members still live adjacent to these traditional fishing grounds.

In 1979, this Court confirmed the right of the successors to the Grand Traverse Ottawas and Chippewas to commercial fishing as secured in the treaties of 1836 and 1855. *See United States v. Michigan,* 471 F.Supp. 192 (W.D.Mich.1979), *mod. in part,* 653 F.2d 277 (6th Cir.1981), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). On appeal, the Sixth Circuit ruled that the Native Americans' treaty-reserved rights were not unbounded; rather, the rights could be subject to the least restrictive state regulation necessary for the conservation of the Great Lakes fishery resources. *United States v. State of Michigan,* 653 F.2d at 279 (citing *People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199 (1976)).

In the fall of 1983, the GTB and two other tribes filed a motion to allocate the fishery resources between themselves and the State, consistent with their treaty rights and necessary conservation measures. One year later, the Court appointed a special master to supervise pre-trial matters and facilitate a settlement. On March 28, 1985, an Agreement for Entry of Consent Order was signed by representatives and attorneys for the parties and several amici curiae. Shortly thereafter, however, the Agreement was rejected by one of the Tribes in a referendum. The Court held a brief trial on the allocation motion; and on May 31, 1985, the Court adopted the Allocation Plan embodied in the Agreement for Entry of Consent Order, with the plan to be in effect for 15 years.

Among other matters, the 1985 consent order divides Lake Michigan into several hundred grids, or zones, in order to allocate and track the fishery resources. The consent order reserves the three main grids surrounding Leelenau Peninsula in Lake Michigan for the exclusive commercial use of the GTB. These grids, numbered 615, 714 and 715, lie in the traditional tribal fishing waters reserved in the Treaty of 1836. Grid 715 is located in Grand Traverse Bay and encompasses relatively calm waters due to the protection of the land masses. Grids 615 and 714 encompass relatively open waters in Lake Michigan. George Duhamel, a GTB fisher, and John Robertson, a fisheries biologist and Chief of the Fisheries Division of the MDNR, both testify that fish stocks in these open waters are safely pursued only from large, non-trailerable fishing vessels.

The consent order also provides that the GTB could fish in grids located further from Leelenau Penninsula "both for chubs, utilizing small mesh gill nets deeper than 40 fathoms, and other species, utilizing impoundment gear. ...." James Mitchell, a GTB fisher, Thomas Gorenflo, a fisheries biologist and Director of the Intertribal Fisheries and Assessment Program (ITFAP), and John Robertson of the MDNR all testify that access to these chub and whitefish fisheries requires the use of large vessels that cannot be trailered. Impoundment fishing requires

trap-net boats larger than 40 feet in length; deep-water chub fishing is accomplished with large gill-net tugs.

The Northport and Leland marinas lie on opposite sides of the Leelenau Peninsula. The Northport Marina lies on the eastern shore of the peninsula and is the closest docking facility to grid 615. Leland Marina is the only facility in grid 714 along the western shore. No other marinas, public or private, exist from Northport all the way around the Leelenau Peninsula to Leland. A ten-slip tribal marina on tribal lands on the eastern shore has not yet been completed. The distance by water from existing moorage sites at Suttons Bay, Peshawbestown or Omena to commercial fishing sites in grid 714 is 20 to 30 miles. Depending upon weather conditions, a round trip could minimally take over six hours to complete. Grids located further into the Lake off of the Leelenau Peninsula are virtually inaccessible.

Beginning in mid 1993, George Duhamel began to occasionally moor his commercial fishing vessel at the public marinas in Northport and Leland. However, Northport and Leland have contracts with the State of Michigan limiting the commercial use of their marinas. The township of Leland obtained financial assistance from the State of Michigan and the federal government for constructing the marina contingent upon an agreement with the MDNR signed in May, 1967, to the effect that the marina was to be used primarily by recreational watercraft. The agreement provides that no commercial vessel may be permitted to "regularly" use the facilities without prior written approval from the municipality and a division of the MDNR. The facilities include 58 slips available for mooring of transient craft allowed to stay for as long as two weeks. Including slips and rafting, the marina can accommodate 120 vessels.

The Village of Northport entered into a similar agreement with the MDNR in 1988. However, not only does the Northport agreement prohibit "regular" commercial use absent prior written approval, it also provides that "commercial fishing vessels licensed as such shall not, under any circumstances, be permitted to use the facilities constructed hereunder for the mooring of recreational watercraft." The record before the Court reflects that the Northport marina has a slippage capacity of 116 boats. The slips are categorized as follows: 41 for transient craft; 54 seasonal; five commercial; 10 broadside transient; six broadside overflow transient.

In 1991, Northport granted a 114–foot schooner, the "Manitou", permission to moor on a regular basis. The Manitou is a commercial venture in that the ship takes passengers on excursions out onto Lake Michigan. It occupies the five commercial slips for a few days each week, and these days seldom fall on weekends. It is not clear whether the ship remains at the marina all year.

When Mr. Duhamel began mooring his vessel at the marinas he was told he could not continue to do so because of the townships' contracts with the MDNR. On July 2, 1993, when Mr. Duhamel refused to remove his vessel from a mooring slip at the Northport Marina and issued his opinion on the matter with a few choice words, he was arrested for trespassing and disturbing the peace. The following year, he was threatened with arrest when he attempted to moor his vessel at the marina in Leland. According to the GTB, other fishers have been instructed that they too cannot moor at either harbor facility. During pre-litigation discussions, the municipalities told tribal representatives that GTB fishers attempting to moor at the marinas would be subject to arrest for trespassing. The municipalities, through litigation, point-out that the Michigan Constitution grants them the power to regulate the use of public places. *See* Mich. Const. Art. V §§ 22, 29.

Unable to secure relief through negotiation, the GTB filed this suit claiming that the municipalities' and MDNR's policies restricting commercial use of the marinas violate the GTB's treaty reserved right to fish, frustrate prior orders of this Court (the consent order, in particular), and effect a deprivation of property without due process of law. The GTB also has lodged equal protection claims against Northport and the MDNR. The claim against Northport relates to the permission to moor granted the Manitou. The claim

against the MDNR rests on the grounds that the MDNR permits, or convinced the relevant municipalities to permit, other commercial vessels (including other Native American commercial fishing vessels) mooring access at other marinas despite similar commercial use restrictions.

The GTB seeks declaratory and injunctive relief as well as any other such relief as the Court deems appropriate. *See* 28 U.S.C. §§ 2201, 2202.

### Standard

In reviewing a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, this Court should only consider the narrow questions of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a Rule 56 motion, the Court cannot resolve issues of fact, but is empowered to determine only whether there are issues in dispute to be decided in a trial on the merits. *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987); *In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 908 (6th Cir.1982). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989).

A motion for summary judgment requires this Court to view " 'inferences to be drawn from the underlying facts … in the light most favorable to the party opposing the motion.' " *Matsushita Electric Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)), *quoted in Historic Preservation Guild v. Burnley,* 896 F.2d 985, 993 (6th Cir.1989). On the other hand, the opponent has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a *'genuine issue for trial.'* " *Historic Preservation,* 896 F.2d at 993 (quoting *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356).

### DISCUSSION

With this opinion, the Court resolves the claim under the treaties, the claim to enforce the consent decree, and the equal protection claims.[1]

### The Treaty Claim

The GTB claims that its fishers have a right under the Treaty of 1836 to use the Leland and Northport marinas for commercial fishing purposes regardless of state and municipal restrictions on such use. In particular, the GTB seeks the right to use mooring slips and other improvements. This Court has jurisdiction over the claim pursuant to 28 U.S.C. § 1362.

1. GTB's 42 U.S.C. § 1983 claim for deprivation of property without due process will not be resolved herein. The GTB has not briefed, and the defendants have not had an opportunity to respond to, the merits. To the extent that the GTB claims the consent decree as a source in itself of a property right, the claim cannot be made. *See Green v. McKaskle* 788 F.2d 1116 (5th Cir.1986). Assuming a § 1983 claim can be made for a treaty-based property right, whether the claim is one for a procedural due process violation under the 14th amendment *simpliciter, see Mertik v. Blalock,* 983 F.2d 1353, 1359 (6th Cir.1993), or for a substantive due process violation, *see id.* at 1367, the defendants should have an opportunity to be apprised of, and respond to, the nature of the plaintiff's claim or claims.

Assuming a statute of limitations applies to such a claim, the parties should consider *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236 n.

15, 20 L.Ed.2d 1231 (1968), and *National Advertising Co. v. City of Raleigh,* 947 F.2d 1158, 1163 (4th Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992) and *Gilbert v. City of Cambridge,* 932 F.2d 51 (1st Cir.1991), *cert. denied,* 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 153 (1991), and *Ocean Acres Ltd. v. Dare County Bd. of Health,* 707 F.2d 103, 106 (4th Cir.1983), and cases cited therein.

In particular, the parties should advise the Court whether the commercial-use restrictions took the force of law (as in the case of an ordinance) when the municipalities adopted the agreements with the MDNR by resolution, and whether that makes any difference. *See Rollingwood Homeowners Corp. v. Flint,* 386 Mich. 258, 191 N.W.2d 325 (1971). To the extent the MDNR wishes to continue to rely on other similar agreements as evidence of intent, those agreements should be placed in the record.

## Statute of Limitations Defense

■ Leland and Northport appear to urge this Court to borrow a state statute of limitations and find time-barred the GTB's treaty-right claim of access. "There is no federal statute of limitations governing federal common law actions by Indians to enforce property rights." *Oneida County, N.Y. v. Oneida Indian Nation*, 470 U.S. 226, 240, 105 S.Ct. 1245, 1254, 84 L.Ed.2d 169 (1985). Usually, a state statute of limitations for an analogous action is borrowed where there is no federal statute of limitations. *Id.* But a state statute of limitations is not borrowed where doing so would be inconsistent with federal policies. *Id.*

■ When Congress established statutes of limitation for certain claims brought by the United States on behalf of Native Americans, it specifically excluded from the limitations those actions brought by Native Americans themselves to "establish title to, or right of possession of real or personal property." *See* 28 U.S.C. § 2415(c). Access rights and profit a prendre rights are property, or interests in land. *See Peaslee v. Dietrich*, 365 Mich. 338, 112 N.W.2d 562 (1961) (easement); *St. Helen Shooting Club v. Mogle*, 234 Mich. 60, 207 N.W. 915 (1926) (profit a prendre). Treaty-reserved rights to access traditional fishing areas and catch fish are property rights protected by the United States Constitution. *See Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 853 F.Supp. 1118, 1125 (D.Minn.1994); *Muckleshoot Indian Tribe v. Hall*, 698 F.Supp. 1504, 1510 (W.D.Wash.1988). Borrowing a state statute of limitations for a claim brought by Native Americans pursuant to 28 U.S.C. § 1362 for property rights established by a treaty with the United States would be inconsistent with Congressional intent. *See Oneida*, 470 U.S. at 241–42, 105 S.Ct. at 1255–56; *Mille Lacs*

*Band of Chippewa Indians v. State of Minnesota*, 853 F.Supp. at 1125. Therefore, this Court declines to seek or borrow a limitations period for this treaty-based claim.

## The Right of Access

This Court has already held that the successors to the Grand Traverse Ottawa and Chippewa have a right to fish Lake Michigan as reserved in the Treaty of 1836. *See United States v. Michigan*, 471 F.Supp. 192, 253–59 (W.D.Mich.1979), *mod. in part*, 653 F.2d 277 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). There is no dispute that the GTB is a successor to the Ottawa and Chippewa signatories of the 1836 and 1855 treaties with the United States.

■ The GTB's treaty-reserved right to fish includes the right to access traditional fishing grounds. *United States v. Winans*, 198 U.S. 371, 380, 25 S.Ct. 662, 663–64, 49 L.Ed. 1089 (1905); *United States v. State of Oregon*, 718 F.2d 299, 304 (9th Cir.1983); *Lac Courte Oreilles Band, Etc. v. Voigt*, 700 F.2d 341, 352 (1983); *Hall*, 698 F.Supp. at 1512; *United States v. Michigan*, 471 F.Supp. at 253–54, 276. The treaties of 1836 and 1855 "fixe[d] in the land such easements as enable the fishing right to be exercised." *Winans*, 198 U.S. at 384, 25 S.Ct. at 665; *United States v. State of Michigan*, 471 F.Supp. at 276.

There is no material dispute that the Ottawa and Chippewa reserved a servitude, or easement of access, on the land occupied by the Leland and Northport marinas. *Winans*, 198 U.S. at 381, 384, 25 S.Ct. at 664, 665; *United States v. State of Michigan*, 471 F.Supp. at 254, 259–60, 276; McClurken affid. ¶ 20.[2] Rather, Leland and Northport dispute the scope of that right.

---

**2.** .... Where the grant of an easement such as a way does not definitely locate it ... or in the case of an implied way, such as a way of necessity, a reasonable and convenient way for all parties is thereby implied in view of all the circumstances. However, ... the grantee does not have a right to go at random over any and all parts of the servient estate.... While directness of route is considered essential in locating a way of necessity, it is equally important that the party entitled to the way of neces-

sity has a right to a convenient way, giving him reasonable access to his property.

As a general rule where, at the time of a grant of an unlocated right of way across certain land, there is in use on the land a way plainly visible and known to the parties, this way will be held to be the location of the way granted, unless it is not a reasonable and convenient way for both parties.

25 Am.Jur.2d, Easements and Licenses §§ 65, 66 (1995).

Leland and Northport contend that the treaty-reserved right of access is, as a matter of law, no more than a right of ingress and egress which could never entitle the Native Americans to use improvements such as mooring slips.[3] *Cf. Winans,* 198 U.S. at 381, 25 S.Ct. at 664 (treaty preserved the right to cross land to reach the accustomed fishing area along a river). These defendants misconstrue the scope of the right.

Like the Supreme Court in *Winans,* this Court finds basic common law principles instructive. The intended scope of an easement of way defines the rights thereto. *See, e.g., Thies v. Howland,* 424 Mich. 282, 296, 380 N.W.2d 463 (1985); *Cabal v. Kent Co. Rd. Comm.,* 72 Mich.App. 532, 536, 250 N.W.2d 121 (1976); *United States ex rel. Tennessee Valley Auth. v. Hughes,* 408 F.2d 619, 621 (6th Cir.1969); 25 Am.Jur.2d *Easements and Licenses* §§ 72, 76 (1995). To discern the intended scope of the GTB's right of access requires consulting the treaty which reserved the right of access and prior Court constructions of that treaty.

Native American treaties with the United States are construed liberally in favor of the Native Americans. *See Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *United States v. State of Michigan,* 471 F.Supp. at 251–53 (citing authority); *People v. LeBlanc,* 399 Mich. 31, 40, 248 N.W.2d 199 (1976) (citation omitted). "In the 1836 Treaty, the Ottawa and Chippewa understood that they could continue to use the land to the extent necessary to continue to live [as fishers]." *United States v. State of Michigan,* 471 F.Supp. at 238. The easement reserved was not merely to the lip of the Lake. The Ottawa and Chippewa retained for their successors that access which would enable their successors to meaningfully fish from traditional areas. *See Winans,* 198 U.S. at 381, 384, 25 S.Ct. at 664, 665;

*United States v. State of Michigan,* 471 F.Supp. at 238. In this way, the right is analogous to an easement of access implied by reservation or implied by necessity. *See United States v. State of Michigan,* 471 F.Supp. at 276 (citing *Winans).* *See also, Burdess v. United States,* 553 F.Supp. 646, 650 (E.D.Ark.1982) (easements implied by reservation or necessity grant that access which enable the beneficial use and enjoyment of property).[4] The right retained was not considered onerous by the United States when the treaties were signed. *See United States v. Michigan,* 471 F.Supp. at 238, 279. After all, the non-Native American settlers were the Native Americans' primary trading partners, *see id.* at 256–57, and they obtained from the natives a substantial amount of land in the bargain.

Like the fishing right itself, the implied right of access is not static. The scope of the right of access must accommodate the fishers' equipment because the treaties placed no limits on fishing methods:

> [T]he means used to fish were not restricted by the Treaty of 1836 . . . . The Indians' right to fish . . . . is not limited as to . . . the manner of taking. The right may be exercised utilizing improvements in fishing techniques, methods and gear. It may expand with the commercial market which it serves, and supply the species of fish which that market demands, whatever the origin of the fish. *Peterson v. Christensen,* 455 F.Supp. 1095 (E.D.Wis.1978); *United States v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974); *State v. Gurnoe,* 53 Wis.2d 390, 192 N.W.2d 892 (1972).

*United States v. Michigan,* 471 F.Supp. at 260. The GTB fishers do not lose their right to access traditional fishing areas simply because circumstances demand that they employ particular fishing gear. *See id. Accord* F.T. Chen, Annotation, *Extent and Reason-*

---

**3.** The municipalities' contention appears to be in conflict with the concession that the GTB fishers have the right to use launching ramps. Launching ramps are themselves improvements which were not in place at the time of the treaties. *See* 41 Am.Jur.2d *Improvements* § 1 (1995); Black's Law Dictionary 682 (1979 ed.).

**4.** An easement implied by reservation is perhaps the more apt analogy for the matter at hand because Leland and Northport are located on tracts which were used by the Ottawas and Chippewas to access their traditional fishing areas at the time of the treaties of 1836 and 1855. *See Burdess,* 553 F.Supp. at 650. However, for the reasons delineated in footnote 2, the distinction is essentially moot.

*ableness of Use of Private Way in Exercise of Easement Granted in General Terms,* 3 A.L.R.3d §§ 6, 11 (1965) (citing authority).

The fact that the municipalities improved, or even created, the access to the Lake and fishery (with federal, state, and local funds) far from precludes the use of the improvement by the GTB fishers. *See, e.g., Colorado Mountain Properties v. Heineman,* 860 P.2d 1388 (1993); *Storms v. Bergsieker,* 254 Mont. 130, 135, 835 P.2d 738, 741 (1992) (Turnage, C.J., concurring)(citing Restatement of Restitution, § 106 (1939)); *Dinosaur Development, Inc. v. White,* 216 Cal.App.3d 1310, 265 Cal.Rptr. 525 (1989); *Wendover Road Property Owners Assoc. v. Kornicks,* 28 Ohio App.3d 101, 502 N.E.2d 226 (1985) (use by dominant estate of servient estate's Improvement to, or creation of, an easement without even creating right to contribution).

▪▪▪ Accordingly, the GTB fishers have an easement of access over the Leland and Northport harbor facilities reasonably necessary for meaningful commercial fishing from traditional sites. *See Winans,* 198 U.S. at 381, 384, 25 S.Ct. at 664, 665; *United States v. Michigan,* 471 F.Supp. at 238, 253–57, 259–60, 277–78. Generally, where such a way is used by two primary parties, neither party may unreasonably interfere with the use of the other. *See e.g., Baer v. Dallas Theater Center,* 330 S.W.2d 214 (Tex.Civ. App.1959) (shared driveway). *See also, Musser v. Loon Lake Shores Assoc.,* 384 Mich. 616, 186 N.W.2d 563 (1971) (common easement to lake). Of course the reasonableness of a tribal fisher's use must be viewed with the broad and unfettered scope of the fishing right in mind. *See United States v. Michigan,* 471 F.Supp. at 280–81. As for the use by the municipalities and the MDNR, it bears reminding that all citizens have "the *responsibility* . . . to see that treaty-protected rights . . . are carried out . . . in a spirit which generously recognizes the full *obligation* . . . to protect the interests of a dependent people." *Id.* (emphasis added).

On the undisputed facts, the GTB proves its treaty-right of access. Leland and Northport assert in conclusory fashion that the GTB members may exercise their treaty right without mooring their vessels; rather, the commercial fishers can trailer their boats in and out of the marinas through the use of an access ramp. However, the unrefuted testimony of two biologists and two fishers establish that large non-trailerable vessels and certain types of gear not amenable to smaller vessels are necessary for GTB fishers to safely harvest fish from certain traditional fishing areas around the end of Leelenau Peninsula. Fishery statistics corroborate the testimony.

John Robertson, Chief of the Fisheries Division of the MDNR, testifies that it simply is not safe to fish with gill-nets in the open waters of grids 714 and 615 in small, trailerable boats. The waves tend to swamp the sides of the boats. Thomas Gorenflo, of the Inter–Tribal Fisheries and Assessment Program (ITFAP) testified that, for this reason, deep water and open water fishing is generally accomplished with large tugs that cannot be trailered in and out of a marina on a daily basis. George Duhamel, one of the GTB fishers, testified further that:

> Even if I had a trailer and truck large enough to haul a vessel this size, it would still be necessary to moor my vessel occasionally at public marinas to: tend nets set temporarily away from normal fishing areas in Grand Traverse Bay, to unload nets, off-load fish, and seek shelter from storms.

For other grids located further out in the Lake from the Leelenau Peninsula, this Court's 1985 Consent Order requires for conservation reasons that the GTB fishers use small mesh gill nets deeper than 40 fathoms when fishing for chubs, and impoundment gear when fishing for other species. See Consent Order ¶¶ 24, 25. This equipment requires the use of large vessels that cannot be trailered on a daily basis. James Mitchell, another GTB fisher testified:

> To fish for chubs . . . it is necessary to use a large fishing tug which cannot be trailered and launched at public access launching ramps. Likewise, to fish for whitefish or other species using impoundment gear . . . it is necessary to use a large trap net boat which also cannot be trailered and launched at public access sites.

Thomas Gorenflo and John Robertson corroborate James Mitchell's testimony.

The nearest harbors to these grids, other than Leland and Northport, would require round trips of between five and ten hours, leaving too-short a time for tending nets and retrieving fish. *See* Robertson affid; Duhamel affid. There simply is no material dispute of fact that GTB fishers reasonably require the ability to occasionally moor their vessels at Northport and Leland in order to: access traditional fishing areas in grids 714 and 615, fish with impoundment gear and fish for chubs, unload nets, off-load fish, and seek shelter during emergencies.

Whether or not there is some limit on the GTB's right of access based on interference with the municipalities' and MDNR's use of the improvements to the marinas, any such limit has not been exceeded here. The fishers maintain that they need to access the marinas only occasionally, for periods commensurate with what the municipalities and the MDNR consider "transient" use of up to two weeks. There are no more than a few tribal fishers in the community. The GTB's own marina will consist of only ten slips once completed. There is no evidence that all the fishers fish the same places at the same time; and, to the Court's knowledge, no more than three tribal vessels have ever attempted to moor at the same time at the same marina. The marinas each consist of over 100 slips for mooring, about half of which are reserved for transient use. The marinas are essentially vacant for nine months out of the year; only during the summer months would the GTB fishers even have an opportunity to obtain a slip that might otherwise be occupied by a non-tribal vessel. No evidence has been offered to indicate why a tribal fisher could not be treated as any other transient vessel seeking a slip during the summer months. Nor even has it been demonstrated why an occasional tribal vessel could not be given preference during the peak season.

Nor does this Court find persuasive Leland's and Northport's assertion that the Native American fishers will begin random docking at public and private docks throughout the Great Lakes. It is well established law that an easement of way is the easement of way. *See* supra note 2; *Moore v. White,* 159 Mich. 460, 464, 124 N.W. 62 (1909); 25 Am.Jur.2d at § 64–70. Having selected the Leland and Northport marinas, the GTB fishers would have to establish some necessity to dock anywhere else for commercial fishing purposes.

Accordingly, the GTB is entitled to summary judgment on its claim to establish its treaty-reserved right to access improvements to the marinas such as mooring slips. This right is protected under the Supremacy Clause of the United States Constitution. *See United States v. Michigan,* 471 F.Supp. at 280–81.

■ Declaratory and injunctive relief are appropriate because the municipalities continue to assert that the commercial-use restrictions in the contracts with the MDNR, and the power conferred on municipalities under the Michigan Constitution to regulate public places, permit the municipalities to bar GTB fishers from the marinas. *See Kelley v. E.I. DuPont de Nemours and Co.,* 17 F.3d 836, 844–45 (6th Cir.1994)(case or controversy). Furthermore, George Duhamel was arrested for trespassing and disturbing the peace when he moored at the Northport marina in 1992, and threatened with arrest when he attempted to moor at the Leland marina in 1993. The municipalities indicated in pre-litigation discussions with tribal representatives that tribal fishers would be arrested for trespassing if they attempted to moor.

### Claim to Enforce Prior Court Orders

■ The GTB also seeks to enforce prior court orders; and, in particular, this Court's 1985 Consent Order in United States v. Michigan, File No. 2:73–CV–26.

■ This Court has the power to fashion such relief as may be necessary for compliance with a prior Court order. *See, e.g.,* 28 U.S.C. § 1651(a); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 692–96, 99 S.Ct. 3055, 3077–80, 61 L.Ed.2d 823 (1979); *United States v. Michigan,* 508 F.Supp. 480, 487–90 (W.D.Mich.1980). The Consent Order preserved the Native American fishing rights as recognized in the opinion reported at 471

F.Supp. 192, subject to certain conservation measures and conditions designed to facilitate the management of a common resource. *See* Agreement for Entry of Consent Order ¶ 7, *et seq;* discussion, *supra.*

■ A consent order has both contractual and judicial aspects. *United States v. Michigan,* 940 F.2d 143, 150 (6th Cir.1991). "It is both a voluntary settlement agreement which could be fully effective without judicial intervention and a final judicial order placing the power and prestige of the court behind the compromise struck by the parties." *Vanguards of Cleveland v. City of Cleveland,* 23 F.3d 1013, 1017 (6th Cir.1994) (internal quotes and ellipses omitted). *See also, e.g., Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. at 694–95, 99 S.Ct. at 3078–79 (upholding district court's assumption of control and allocation of fishery resources). This Court has continuing jurisdiction under the consent order; and, in any case, there is no statute of limitations on issuing process to enforce a prior order in a Native American treaty case. *See Hamilton v. Nakai,* 453 F.2d 152, 158 (9th Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972).

■ Leland and Northport unwisely encourage a certain Balkanization of the State of Michigan by contending that, as non-parties to the prior decisions of this federal Court, they are not bound by the orders. It is well settled law that "nonparties who interfere with the implementation of court orders establishing public rights may be enjoined" and, "a court possessed of the res in a proceeding in rem, such as one to apportion a fishery, may enjoin those who interfere with that custody." *Washington Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. at 693 n. 32, 99 S.Ct. at 3078 n. 32. The res here is the right to access the fishery resources in Lake Michigan. *See United States v. Crookshanks,* 441 F.Supp. 268, 270 (D.Or.1977). Indeed, under the All–Writs Act, 28 U.S.C. § 1651, this Court has the power to issue necessary and appropriate orders relating to those "who, though not parties to the original action . . ., are in a position to frustrate the implementation of a court order or the proper administration of justice." *United States*

*v. New York Telephone Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977).

A federal district court's "equity power is broad and flexible and the propriety of an order turns on a balancing of individual and collective interests in the particular case." *Morgan v. McDonough,* 548 F.2d 28, 31 (1st Cir.1977). As previously discussed, the GTB fishers cannot participate in the court-ordered conservation programs requiring particular fishing gear or fish from grids reserved for their exclusive commercial use absent certain limited mooring access. The municipalities insist on a year-round blanket ban on use by commercial fishers. The court ordered program is quite plain and clear; the municipalities' actions impede compliance with the program.

The MDNR urges an order declaring the tribe has access only outside of the peak recreational season. The invitation is declined because the parties indicate that, once the general scope of the access right is made clear, a solution on joint use may be achieved. Nor does the Court wish to issue an order possibly fringing upon the GTB's treaty right, a right upon which the GTB has sought declaratory relief.

Similarly, the court does not agree with the GTB to the extent that the GTB appears to urge that tribal fishers need to permanently moor. Moorage has not been shown to be necessary for compliance with the Consent Order. The Court declines to issue relief for interference with the Consent Order to any greater or lesser extent than that to which the Order has been frustrated. But, any further interference by Leland or Northport with the Consent Order will result in injunctive action and any other necessary relief.

### Equal Protection Claim

The GTB also alleges claims pursuant to 42 U.S.C. § 1983 for violations of its fishers' constitutional right to the equal protection of the laws. One claim is lodged against Northport, the other against the MDNR.

■ The GTB contends that Northport violated the GTB's right to the equal protection of the laws by forbidding the mooring of

GTB commercial fishing vessels while permitting the continuous mooring of the commercial vessel Manitou. The Manitou is a vintage 114–foot passenger sailing vessel which takes passengers on over-night excursions on Lake Michigan. The GTB has not presented direct evidence of discrimination. In order to state a *prima facie* equal protection claim without direct evidence, the GTB must establish that the Manitou is owned and operated by a non-Native American and that the tribal fishing vessels are "similarly situated" to the Manitou. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Kalina v. Railroad Retirement Board,* 541 F.2d 1204, 1205 (6th Cir.1976), *aff'd,* 431 U.S. 909, 97 S.Ct. 2164, 53 L.Ed.2d 220 (1977). *See also, LRL Properties v. Portage Metropolitan Housing Authority,* 55 F.3d 1097, 1111 (6th Cir.1995); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992).

The Court finds nothing in the record identifying the status of the owners or operators of the Manitou. Furthermore, in order to be deemed "similarly situated", the vessels at issue here must have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their different treatment. *See Mitchell,* 964 F.2d at 583; *Kalina,* 541 F.2d at 1205. Under this standard, commercial fishing vessels and commercial passenger sailing vessels cannot be deemed similarly situated. The unloading of fish and tending of nets are a different form of interference with the recreational policies than the loading and unloading of people from a vintage vessel, however less frequent or continuous. Accordingly, the GTB's motion for summary judgment will be denied, and Northport's motion for summary judgment will be granted.

The GTB claims that the MDNR violated the equal protection clause because the MDNR permitted the mooring of some commercial fishing vessels at other Michigan marinas despite commercial-use restrictions, but failed in its efforts to persuade Northport and Leland that the commercial-use restrictions were not applicable to the GTB. The touchstone of any discrimination claim under the constitution is an intent to discriminate. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977). No inference of a discriminatory intent on the part of the MDNR may be drawn from the recalcitrance of Northport and Leland. In any case, the commercial users permitted to moor on occasion at the other marinas include several Native American commercial fishers.

Accordingly, the GTB is not entitled to summary judgment on the GTB's equal protection claim against the MDNR. The MDNR has not moved for summary judgment, but the Court will nevertheless dismiss the claim *sua sponte.*

### CONCLUSION

Given the broad treaty right to employ any fishing equipment not restricted for conservation reasons, barring the tribal fishers from that access required for equipment ordered under the Consent Decree contravened that court order as well as the treaty right itself. Here, to violate the one was to violate the other.

This Court declares that the GTB fishers have the right under the treaties of 1836 and 1855 to "transient" use of mooring slips and associated improvements at the Leland and Northport marinas in order to: access traditional fishing areas in grids 714 and 615, fish with impoundment gear and fish for chubs, unload nets, off-load fish, and seek shelter during emergencies. Furthermore, this Court declares that Leland, Northport and the MDNR may not interfere with this right without violating both the treaties backed by the Supremacy Clause of the United States Constitution and this Court's 1985 Consent Order issued in *United States v. Michigan,* File No. 2:73–CV–26. The Court declines to issue an injunction on the parties' representations that declaratory relief will permit access issues to resolve themselves.

The GTB is not entitled to summary judgment on its civil rights claims. Northport and the MDNR are entitled to summary judgment on the equal protection claim. Neither Northport nor Leland is entitled to summary judgment on any other claim.

**294**

No rational trier of fact could conclude otherwise.