**GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS, Plaintiff–Appellee,**

v.

**DIRECTOR, MICHIGAN DEPARTMENT OF NATURAL RESOURCES, Defendant,**

**Township of Leland; Village of Northport, Defendants–Appellants.**

No. 96–1168.

United States Court of Appeals, Sixth Circuit.

Argued July 28, 1997.

Decided April 15, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied June 10, 1998.*

---

* Judge Ryan would grant rehearing for the reasons stated in his dissent.

William Rastetter (argued and briefed), Cedar, MI, John F. Petoskey (briefed), Grand Traverse Band Legal Department, Suttons Bay, MI, for Plaintiff–Appellee.

William M. Davison, Cunningham, Davison, Beeby, Rogers & Alward, Stephen O. Schultz (argued and briefed), Foster, Swift, Collins & Smith, Lansing, MI, James L. Wernstrom, Thomas J. McGraw, Law, Weathers & Richardson, Grand Rapids, MI, for Director, Michigan Department of Natural Resources and Township of Leland.

Stephen O. Schultz, Foster, Swift, Collins & Smith, Lansing, MI, James L. Wernstrom, Thomas J. McGraw, Law, Weathers & Richardson, Grand Rapids, MI, for Village of Northport.

Before: JONES, NELSON, and RYAN, Circuit Judges.

JONES, J., delivered the opinion of the court, in which NELSON, J., joined. RYAN, J. (pp. 642–643), delivered a separate dissenting opinion.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Defendants,[1] the Village of Northport and the Township of Leland ("municipalities"), appeal from a partial grant of summary judgment for the Plaintiffs, the Grand Traverse Band of Ottawas and Chippewas ("GTB"). GTB sued to enforce its treaty based claim to establish transient mooring access to the Leland and Northport Marinas as well as declarative relief pursuant to a 1985 consent order. For the reasons that follow, we affirm.

## I. Background

GTB is the successor in interest to the Grand Traverse Band of Ottawas and Chippewas, who along with other Native American tribes, signed two treaties with the United States in 1836 and in 1855. In these treaties, the Ottawas and Chippewas reserved the right to continue commercial and subsistence fishing in the Great Lakes Region. The tribes, however, ceded their lands (most of what is now the State of Michigan) to the United States government. Specifically, the 1836 treaty reserved for the Ottawas and Chippewas the right to fish in their usual places, which included the waters off the Leelanau Peninsula. *Treaty of Washington,* 7 Stat, 491. The 1855 treaty preserved a reservation located adjacent to these traditional fishing grounds. *Treaty of Detroit,* 11 Stat. 621. The land and water areas upon which the Leland and Northport marinas

now rest, historically, were used by the Ottawas and Chippewas to access fishing sites in Lake Michigan and Traverse Bay.[2]

The Township of Leland is located on the west side of the Leelanau Peninsula on the Grand Traverse Bay. The Leland Marina lies on that side of the Peninsula. The Leland Marina has 58 mooring slips which can hold up to 120 vessels. The Village of Northport shore is located on the eastern shore of the Leelanau Peninsula where the Northport Marina is located. Northport Marina has 100 slips, including 5 dedicated to commercial use and can accommodate up to 116 vessels. Each marina is owned and operated by the corresponding municipality.

During the 1970s, the United States instituted litigation against the State of Michigan in order to protect Native American fishing rights. As a result of this litigation, the district court expressly found that the 1836 and 1855 treaties gave Native American treaty fishers, including GTB, the right to fish for subsistence and commercially in the Great Lakes Region. *United States v. Michigan,* 471 F.Supp. 192, 216 (W.D.Mich.1979), *mod. in part,* 653 F.2d 277 (6th Cir.1981). The district court further held that this right could not be burdened or abridged by the State of Michigan. *Id.* at 270. On appeal, this court affirmed that the treaties gave Native Americans the right to fish the Great Lakes, a right restricted only by state conservation efforts that utilized the least restrictive means available. *United States v. Michigan,* 653 F.2d 277, 279 (6th Cir.1981).

After remand, the parties involved in the litigation signed a consent order which was adopted by the district court on May 31, 1985, and was to be in effect for 15 years.[3]

---

**1.** The Director of the Michigan Department of Natural Resources ("MDNR") was also a named Defendant in the suit. Significantly, however, MDNR does not appeal the judgment.

**2.** The municipalities appear at some points to assert that their marinas are adjacent to the areas used by treaty fishers for access to their fishing grounds. However, the district court's factual conclusion that the land on which the marinas sit, historically, has been used by treaty fishers to access their traditional fishing grounds was not clearly erroneous. This conclusion is

supported by ample evidence, including an affidavit by Dr. James McClurken, an ethnohistorian who specializes in Native American tribal culture and history. (J.A. at 94–101). Although the municipalities baldy assert that GTB's access to traditional fishing grounds was located adjacent to their marinas, they provide absolutely no evidence to substantiate this claim and do not directly challenge the district court's conclusion on appeal.

**3.** The Village of Leland and the Township of Northport were not named parties to this con-

The district court had adopted this consent order, after a hearing, in which the court explicitly found that it would be "superior to [other plans] in protecting the Indian reserved treaty fishing right." 12 ILR 3079. The consent order granted Native American fishers the exclusive right to commercial fishing in certain areas of Lake Michigan, and restricted their use of other areas. It divided Lake Michigan into several hundred grids or zones, reserving the three main grids surrounding the Leelanau Peninsula (where the Leland and Northport Marinas are located) for the exclusive use of GTB. These grids lie in traditional fishing waters reserved in the 1836 treaty and are numbered 615, 714, and 715 respectively. GTB was also granted exclusive fishing rights in grids 616, 715, 716, 815 and 816.

Additionally, as part of the consent order, GTB agreed to forgo all gill net fishing from small boats in specified zones in order to preserve certain species of fish that had nearly been depleted by over fishing. Thus, GTB began using large boats that cannot be "trailered." [4] The consent order also expressly required the use of impoundment gear in some areas that must also be utilized with large nontrailerable vessels. Grids 615 and 714 are both located in the rough open waters of Lake Michigan that cannot be accessed safely with small boats.

George Duhamel, a GTB member, began docking his commercial fishing vessel at the Northport and Leland Marinas in 1993. Shortly after Duhamel began docking his vessel at the marinas, he was told that he could not moor his vessel at the marinas because of agreements between the municipalities and the State of Michigan that limit the commercial use of the marinas.[5] When Duhamel refused to remove his vessel from the Northport slip in July of 1993, he was arrested. In 1994, Duhamel was threatened with arrest when he attempted to moor his boat at the Leland Marina. On October 17, 1994, after negations between the parties failed, GTB filed suit against MDNR challenging the commercial use prohibitions at the Northport and Leland Marinas. On December 27, 1994, GTB filed an amended complaint adding the Township of Leland and the Village of Northport as Defendants. The parties then filed cross motions for summary judgment. The district court granted partial summary judgment to GTB, finding that the Defendants could not bar GTB's right to use the marinas for commercial fishing without violating the consent order and the 1836 and 1855 treaties.[6] This appeal followed.

## II.

The municipalities raise two arguments on appeal. First the municipalities argue that the district court erred in granting summary judgment on GTB's treaty based claim of mooring access to their marinas. Second, the municipalities argue that the district court erred by granting summary judgment pursuant to the 1985 consent order in which the municipalities were not parties. We review a district court's grant of summary judgment de novo, Russo v. City of Cincinnati, 953 F.2d 1036, 1041–1042 (6th Cir.1992), and findings of fact for clear error. Eastern Kentucky Resources v. The Fiscal Court of Magoffin County, 127 F.3d 532, 539–40 (6th Cir.1997). We will discuss each issue in turn.

### A. Treaty Rights

It is undisputed that the rights retained by GTB in the treaties of 1836 and 1855 included access to its traditional fishing

sent order, which was between the United States Government, the State of Michigan and various Native American organizations, including GTB.

4. Boats that could not be placed onto trailers pulled by a car or truck.

5. Both municipalities have contracts with the State of Michigan limiting the commercial use of their marinas. Leland's agreement with MDNR, signed in May 1967, provides that no commercial vessels may be permitted to "regularly" use the

facilities. (J.A. at 203). Northport's agreement, signed in 1988, prohibits regular commercial use absent written approval, as well as all commercial fishing vessels. (J.A. at 211).

6. GTB also claimed relief pursuant to 42 U.S.C. § 1983, alleging that the municipalities violated its fishers' constitutional right to equal protection of the laws. The district court granted summary judgment to MDNR and the municipalities on this claim, and GTB does not appeal that judgment.

grounds located within the areas of the Leland and Northport marinas. The parties to this dispute, however, question the scope of that right. The municipalities assert that GTB's right to fish does not include a right to occupy the marinas and at most GTB possesses an easement of access over the municipalities' marinas. This right, they argue, is limited to the right of ingress and egress only, and not to a limited use of improvements such as mooring slips.[7] We disagree.

On the outset, we note that it is well settled that Native American treaties must be liberally construed in favor of Native Americans. *State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 676, 99 S.Ct. 3055, 3069–70, 61 L.Ed.2d 823 (1979); *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). The rights granted by the treaties at issue here clearly included the right to fish the waters of the Great Lakes region for both subsistence and commercial fishing.[8] The rights also included an easement of access over the land surrounding these traditional fishing grounds, even were the land to have been privately owned. *See United States v. Winans,* 198 U.S. 371, 381, 384, 25 S.Ct. 662, 665, 49 L.Ed. 1089 (1905) (noting that treaty rights "impose[ ] a servitude upon every piece of land as though described [in the treaty] . . . and fixes in the land such easements as enables the right to be exercised."); *see also Seufert Bros. Co. v. United States,* 249 U.S. 194, 198–99, 39 S.Ct. 203, 205, 63 L.Ed. 555 (1919). This easement, implied by reservation or necessity, reserved the access necessary to allow the treaty fishers to fish from their traditional fishing areas.[9] *See Winans,* 198 U.S. at 384, 25 S.Ct. at 665; *United States v. Michigan,* 471 F.Supp. at 238. As noted, the marinas owned by the municipalities fall squarely within the location of this easement. In addition, the treaties did not in any way, limit the means by which fish were to be taken from the lakes or restrict the treaty fishers to using technology that was in existence at the time of the treaty. *See United States v. Michigan,* 471 F.Supp. at 260 ("The right [to fish] may be exercised utilizing improvements in fishing techniques, methods and gear. It may expand with the commercial market which it serves, and supply the species of fish which that market demands, whatever the origin of the fish.").

In order to continue commercial fishing, however, GTB must utilize large boats that cannot be trailered. Thus, we find that two basic principles mandate that the right of access to GTB's traditional fishing grounds includes the right of transient anchoring of commercial vessels at the municipalities' marinas. First, courts are bound to construe treaties, not only liberally in favor of Native Americans, but in a way to "reserve to the Tribes all rights necessary to effectuate the purpose of the Treaty." *Swim v. Bergland,* 696 F.2d 712, 716 (9th Cir.1983) (citing *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 406, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968); *Winters v. United States,* 207 U.S. 564, 575–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908)); *see also Winans,* 198 U.S. at 380–81, 25 S.Ct. at 663–64 (securing access to fishing grounds over private property because "[n]o other conclusion would give effect to the treaty.").

---

7. The municipalities also devote a large amount of their brief to legal arguments that an easement holder cannot utilize improvements located *adjacent* to an easement. Those legal arguments are completely irrelevant to the present appeal, however, because as noted in footnote 4 supra, the district court's conclusion that the areas on which the marinas now sit was utilized by GTB, is not clearly erroneous.

8. The district court in the *Michigan* litigation, provided a detailed history of the Chippewas' and Ottawas' dependence on fish for both subsistence and commercial resources. *United States v. Michigan,* 471 F.Supp. at 221–225. This dependence stretched back as far as 10,000 B.C. *Id.* at 214.

9. Although a *profit a pendre* is more likely the technical term for GTB's interest because they have a right to take fish from the waters, *see, e.g., Mille Lacs Band of Chippewa v. Minnesota,* 952 F.Supp. 1362, 1376 (D.Minn.1997), *aff'd* 124 F.3d 904 (8th. Cir.1997) (defining *profit a pendre* ), the distinction is not determinative for purposes of this appeal and we find easement law instructive.

In the present case, the scope of the treaty right of access to traditional fishing grounds includes transient mooring on the public property of the municipalities, because not only would a contrary result frustrate the purpose of the treaties, such a result would simply destroy all rights to commercially fish that were conveyed by them. The district court correctly concluded that "[t]here simply is no material dispute of fact that GTB fishers reasonably require the ability to occasionally moor their vessels at Northport and Leland in order to: access traditional areas in grids 714 and 615, fish with impoundment gear and, fish for chubs, unload nets, off-load fish and seek shelter during emergencies." *GTB v. Michigan Dep't of Natural Resources,* 971 F.Supp. 282, 291 (W.D.Mich. 1995). Undeniably, it is not safe to fish in the open waters of grids 714 and 615 in small trailerable boats as testified by John Robertson, Chief of the Fisheries Division of MDNR. These grids require large boats that cannot be trailered in and out of a marina on a daily basis. Moreover, the consent order expressly requires equipment that cannot be trailered on a daily basis. There are no harbors near GTB's fishing areas that would allow GTB to fish with the boats that they must now utilize.[10] Further, even MDNR has recognized the necessity behind GTB's request for access to the mooring slips. Indeed, MDNR has not appealed the judgment, and has previously indicated a willingness to relieve the municipalities of any alleged obligation to prohibit GTB's requested access. (J.A. at 323).[11]

The municipalities do assert that according to "simple logic" the fishing grounds that are now not safely accessed through small boats, were not fishing grounds that were fished at the time of the treaties. This "simple logic," however, is refuted by direct evidence submitted by GTB in the form of affidavits by no fewer than four individuals who all testify to the contrary. Additionally, the fishing grounds reserved by the treaty fishers in the treaties was not limited any specific way. *See United States v. Michigan,* 471 F.Supp. at 231 ("This area include[d] the waters of the Great Lakes . . . ."). Thus, we find that the district court's conclusion in that regard was not clearly erroneous.

■ Secondly, contrary to the municipalities' position, we find that traditional property law concepts do not prohibit the use of improvements on an easement when necessary for effectuation of the easement's purpose. *Cf. United States v. Hughes,* 408 F.2d 619, 621 (6th Cir.1969) ("[T]he owner of the dominant easement has all the rights incident or necessary to proper enjoyment of the easement.") (citing 25 Am.Jur.2d Easements & Licenses §§ 72–75). References to cases such as *Delaney v. Pond,* 350 Mich. 685, 86 N.W.2d 816 (1957), upon which the municipalities base their contentions, are thus easily distinguishable. *See also, Lakeside Launches, Inc. v. Austin Yacht Club, Inc.,* 750 S.W.2d 868 (Tex.Ct.App.1988); *Douglas v. Bergland,* 216 Mich. 380, 185 N.W. 819 (1921). In *Delaney,* for example, the court did restrict an easement of access to a river merely to ingress and egress, and prohibited the dominant estate holder from sun bathing and permanently mooring its boats on the plaintiffs' property. *Delaney,* 86 N.W.2d at 817. The court found that because the easement was an express easement which specifically stated that it was an easement for a right of way, the easement was limited to ingress and egress only. *Id.* The court, however, noted that "[t]he right granted to plaintiffs to make use of the water granted to plaintiffs no rights to the bordering land *beyond that necessary to permit enjoyment of the water rights.*" *Id.* (emphasis added). The court also noted that the "use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Id.; see also Lakeside,* 750 S.W.2d at 871 (noting that the scope of an easement is rendered "to the extent reasonably necessary to afford ingress and egress to the

---

10. The next nearest marina would require round trips of between five and ten hours.

11. MDNR has explicitly stated that their agreements with the municipalities do not preclude the municipalities from providing mooring slips

to GTB, has indicated that the access requested was reasonable under the specific facts, and has noted that the access was necessary to give effect to the 1985 consent order. (J.A. at 173, 313, 323)

owner of the dominant estate and no more."). Because there was no showing in *Delaney* of the necessity of sun bathing on the plaintiff's property or of a *permanent* mooring of the defendant's boats, the court strictly construed the express easement as one for only egress and ingress. *Delaney*, 86 N.W.2d at 817. Here, to the contrary, GTB is forced to utilize boats that cannot be trailered, and will not be afforded ingress and egress, or any access by commercial boats to their fishing grounds, without use of the marinas. Thus, the scope of the easement must include mooring access to the marinas in order to permit use and enjoyment of the easement. Otherwise, an easement of access over the land where the marinas are situated, would be meaningless. Moreover, there was no express easement in this case that was limited to its specific terms, but rather an easement by reservation or necessity the purpose of which was *access* to fishing grounds. Furthermore, the marinas are clearly equipped for the commercial uses envisioned by GTB, which uses will not materially increase the burdens on the marinas. *Cf. Delaney*, 86 N.W.2d at 817 ("A principle which underlies the use of all easements is that the owner of an easement cannot materially increase the burden of it upon the servient estate . . . .") (citing Am.Jur., Easements § 115).

■ Finally, we find other arguments made by the municipalities in order to justify their restriction of GTB's use of the marinas unavailing. As noted, the municipalities contend that agreements with the MDNR mandate that commercial vessels are not permitted at their marinas. This is incorrect for two reasons. First, under the Supremacy Clause of the United States Constitution, treaties override any conflicting state or local laws. U.S. Const., art. VI. Cl. 2; *accord United States v. Michigan*, 471 F.Supp. at 281. Second, as noted, MDNR clearly indicates that it believes that GTB is entitled to access to the marinas and that the agreements provide no interference with that right. *See* note 10, *supra*. Moreover, we note that Northport has already granted a commercial vessel much larger than those owned by GTB permission to use its marina regularly. Thus, the agreements do not provide an obstacle to GTB's use, and the munic-

ipalities have not indicated how GTB would interfere with the use of this property that is already opened for use by the public at large. Significantly, GTB does not request any more mooring rights than those that the marinas already allow. Thus, there are simply no reasons why such use would be prohibited. Accordingly, we hold that the 1836 and 1855 treaties provided for an easement of access to reach traditional fishing grounds which includes the right of transient mooring in the municipalities' marinas.

## B. Consent Order

■ The municipalities assert that the district court incorrectly granted declarative relief pursuant to the 1985 consent order, because the municipalities were not parties to that order. Thus, the municipalities assert that the district court erred by granting partial summary judgment in favor of GTB restricting any interference with the consent order. We do not agree.

■ A district court has the jurisdiction to enforce consent decrees. *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir.1994) (citing *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983)). Such decrees are settlement agreements "subject to continued judicial policing." *Id.* at 1017. In addition, a consent decree must be construed "to preserve the position for which the parties bargained." *Id.* at 1018.

The consent order at issue in this case expressly provided GTB the right to fish in its traditional fishing grounds. This order was litigated and found sufficient to "protect[ ] the Indian reserved treaty fishing right" 12 ILR 3079, established by the 1836 and 1855 treaties, and affirmed by the *Michigan* litigation. *See United States v. Michigan*, 471 F.Supp. 192. The treaty rights, as discussed, include transient mooring access to the marinas. As a result, and in furtherance of the consent order, then, GTB is permitted to moor its vessels at the marinas. To do otherwise would interfere with the express purpose of the consent order.

■ Although the municipalities were not named parties to the order, it is well settled

that third parties who interfere with a court order may be enjoined from doing so. *See Washington State Commercial Passenger Fishing Vessel,* 443 U.S. at 692–93 n. 32, 99 S.Ct. at 3078 n. 32. In *Washington State Commercial Passenger Fishing Vessel,* the Supreme Court found that commercial fishing associations who were interfering with the district court's order pursuant to a Native American treaty, could be bound by the order, although they were not parties to the proceeding that led to the issuance of the order. *Id.* The Court found in the alternative, that the fishing association's members, as citizens of the State of Washington which was a party to the prior proceedings, could be bound on that basis as well. *Id.* We find *Washington State Commercial Passenger Fishing Vessel* controlling. Here too, third parties are attempting to interfere with a prior court order mandating that Native American treaty fishers be permitted to fish in their traditional grounds. Additionally, the alternative basis provided in *Washington State Commercial Passenger Fishing Vessel* is applicable because the Village of Northport and the Township of Leland are instrumentalities of the state. MDNR, is also an instrumentality of the state, and thus any agreements made by MDNR conflicting with the consent order would also be *void abinito* with respect to GTB.

Furthermore, we find the Second Circuit's position in *Association for Retarded Citizens of Connecticut v. Thorne,* 30 F.3d 367 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995), distinguishable.[12] In *Thorne,* the Second Circuit ruled that the district court had improperly joined a third party as a defendant in the litigation and had improperly issued a preliminary injunction against the third party requiring it to abide by the terms of a previously entered final order. *Id.* at 368. The court noted that the All Writs Act, used as a basis for the district court's decision, did not grant a district court the authority to enforce a decree against a nonparty to a privately negotiated settlement agreement. *Id.* at 370.

The court contrasted an instance "[w]here the district court exercises its jurisdiction to rule on the merits of a litigation ... determines that the law requires a certain outcome and is empowered to issue remedial orders to effectuate that outcome," with a privately negotiated consent decree that does not determine the rights and obligations of the parties as required by law. *Id.* In the latter case, the district court found that the All Writs Act does not empower a district court to enforce the privately negotiated decree against those not parties to it. *Id.* In the present case, to the contrary, the consent order was adopted pursuant to litigation which determined that the law expressly required that GTB be permitted to fish the Great Lake region as provided by treaty. Therefore, the Second Circuit's decision is distinguishable here.

### III.

In sum, the treaties of 1836 and 1855 grant GTB access to moor their commercial vessels on the municipalities' marinas. The municipalities may not interfere with this access without violating the treaties and the 1985 consent order. We note that this decision grants only a transient right to moor on an occasional basis in common with the recreational public who also utilize the facilities. Accordingly, the district court's judgment granting partial summary judgment to GTB is **AFFIRMED.**

RYAN, Circuit Judge, dissenting.

In my judgment, the Grand Traverse Band of Ottawa & Chippewa Indians is not entitled to moor its fishing vessels at the marinas at Leland or Northport either by virtue of the Treaties of 1836 and 1855, or by virtue of the consent judgment between the tribe and the State of Michigan. Therefore, I respectfully dissent.

The GTB's brief repeatedly makes the following statement: "In order to have access to the fishing opportunities" to which they

---

**12.** Moreover, the district court, although citing the All Writs Act as permitting the court to fashion orders against third parties who frustrate the implementation of a court order, *see* 28 U.S.C.

§ 1651, expressly declined to issue an injunction pursuant to the Act, noting that declaratory relief would permit access issues to resolve themselves.

are undeniably entitled, the "GTB must be able to utilize mooring slips *at the Leland and Northport marinas,* because no other access exists...." (Emphasis added.) If this proposition is an abbreviated syllogism, it is an invalid one: the term "access" simply does not denote "mooring." I do not dispute that in order to carry on its commercial fishing business, the GTB must use vessels that cannot be trailered; nor do I dispute that in order to use these vessels, the operators must be able to moor them occasionally at a marina. But, rather plainly, it does not follow that the tribe's *need* for marina facilities creates a right to use *Leland's or Northport's* marinas. Perhaps the State of Michigan is obligated to build the GTB a marina; perhaps the GTB must build its own marina; I offer no opinion about these matters. But certainly the GTB's *need* of a marina does not give rise to an obligation on the part of Leland or Northport to *provide* one.

Even the solemn business of interpreting age-old treaty obligations requires the application of some common sense. With all due respect, I fail to see the common sense in construing 1885 Indian fishing rights treaty obligations as including the right to moor commercial fishing vessels in municipal marinas built more than a hundred years later.

The GTB did not use the marinas before the incidents leading to this lawsuit. While the tribe suggests that its enjoyment of its fishing rights was imperfect during this period because it could not dock its boats anywhere, it makes no claim that the building of the marinas had any *adverse* effect on its rights. Thus, the construction of the marinas certainly did not impede access to the fishing grounds, or make access in any sense more difficult; in fact, the existence of the marinas does not interfere with the GTB's access one whit. Likewise, the GTB does not claim it was entitled, either as an incident of its treaty rights or as an incident of the consent order between it and the State of Michigan, to have Leland, Northport, or anyone else build marinas for its use. The GTB's argument is simply that now that the marinas *do* exist, it must be permitted to moor there because mooring is an incident of its right of access to the fishing grounds.

Presumably, since the GTB has a right of access to the waters of Lake Michigan over virtually all of the shoreline ("every piece of land") of the Leelanau Peninsula, the tribe has a corresponding treaty right to moor its boats at every marina to be built hereafter at any location on the shoreline. But that, of course, is absurd.

To me, the fact that using the Leland and Northport marinas would make the GTB's indisputable right of access to Lake Michigan more convenient proves nothing. The municipalities make a persuasive analogy: When a landlocked estate has an implied access easement over a servient estate, that means the landlocked-estate's owners may use a road over the servient estate. And if the road is originally dirt but is paved by the servient-estate's owner, the landlocked-estate's owner may continue using the road, in its new improved state, and is not required to pay for that improvement. But if the servient-estate's owner builds a garage next to the road, the landlocked-estate's easement over the road does not now give rise to a right to spend the night in the garage, no matter how sympathetic the circumstances. Even if the landlocked-estate's owner has been ordered by a court in an unrelated matter not to use a car, and therefore has to walk down the road, and the road is long, and he occasionally gets very tired or caught in a rainstorm while walking down the road, he still is not entitled to take shelter in the garage.

At bottom, my objection is simple. The building of these marinas did not change anything about the GTB's access rights; the marinas neither increased nor decreased the GTB's ability to access the fishing grounds in question. The responsibility for an absence of modern, efficient, and meaningful "access" cannot be laid at the door of Leland and Northport, and therefore, they are not required to ameliorate the problem by allowing commercial fishing vessels to moor at the marinas they built for the exclusive use of recreational vessels.

I would reverse.